IN THE CIRCUIT COURT, OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR LAKE COUNTY, FLORIDA

*2008 CA 1802*

AURELIO R. FELICIANO and MARIA L.
VIEIRA, husband and wife; MASR HOLDINGS,
LLC, a Delaware series limited liability company;
KATHLEEN TESI; GORDON LAWRIE and
MARGARET LAWRIE, husband and wife; C&G
PROPERTIES II, LLC, a Florida limited liability
company; C&G PROPERTIES IV, LLC, a
Florida limited liability company; C&G
PROPERTIES VIII, LLC, a Florida limited
liability company: JUSTIN A. WILLIAMSON IV;
RICHARD JURKOVAC, ALBERT DABAH:
VINCENT PREZIOSI; MICHAEL B. NOEL and
HARRIET V. NOEL, husband and wife; CHARLES
H. KRAFT; DEAN COSPER; REED GALIN and
TOMI JO GALIN, husband and wife: JHM
INVESTMENTS, LLC, a New Jersey limited
liability company; JAMES H. MAYNARD;
JOSE O. FERNANDEZ-MIRALLES and
CLARA CALBIA ORTIZ, husband and wife:
JOHN G. PALATINE and ELIZABETH J.
PALATINE, husband and wife; EMANOIL C.
ROSCA and SOFYA BORT, husband and wife;
JORDAN RUPERT and MYRA RUPERT, husband
and wife; GARY R. SCHEER and SUSAN W.
SCHEER, husband and wife; FRANKLIN
WEINSTEIN and ELIZABETH WEINSTEIN,
husband and wife; STEPHEN P. BOGER and JOAN
BOGER, husband and wife; ROBERT DANIEL
NOEY and KIMBERLY ANN NOEY, husband and
wife; JOSEPH A. MAYERCHECK; PETER
MOUKIOS; GEORGE KRONHEIMER; HAMMOCK
328, LLC, a Florida limited liability company;
HAMMOCK 308, LLC, a Florida limited liability
company; KEITH GRUBB; CARL F. RABITO;
RICK T. FITZGERALD and MIRANDA F.
FITZGERALD, husband and wife; RICHARD
SLOAN and JENNIFER S. SLOAN, husband and
wife; ROBERT STOLTZ; JAMES KANYUK;
DAVID SPERA; SEAN COUCH; ROGER A.
LINVILLE II: ROGER A. LINVILLE III; SALT
LAKE EXCHANGE ACCOMMODATIONS, 131,
LLC, a Utah limited liability company: and
ALBERTINO JORGE and FABIANA JORGE,





14
DL

husband and wife,

     Plaintiffs,

v.                          CASE NO.:   2008 - CA - 1862

GINN REAL ESTATE COMPANY, LLC;
GINN-LA PINE ISLAND LTD, LLLP;
CENTURY 21 PROFESSIONAL GROUP, INC;
REGIONS BANK; SUNTRUST MORTGAGE,
INC: FIFTH THIRD BANK; WACHOVIA BANK,
N.A: and FIRST FEDERAL SAVINGS BANK OF
LAKE COUNTY,

     Defendants.

_____/

## AMENDED COMPLAINT

COME NOW, the Plaintiffs, AURELIO R. FELICIANO and MARIA L. VIEIRA,

husband and wife; MASR HOLDINGS, LLC, a Delaware series limited liability company;

KATHLEEN TESI; GORDON LAWRIE and MARGARET LAWRIE, husband and wife; C&G

PROPERTIES II, LLC, a Florida limited .liability company; C&G PROPERTIES IV, LLC, a

Florida limited liability company; C&G PROPERTIES VIII, LLC, a Florida limited liability

company; JUSTIN A. WILLIAMSON IV; RICHARD JURKOVAC, ALBERT DABAH;

VINCENT PREZIOSI: MICHAEL B. NOEL and HARRIET V. NOEL, husband and wife;

CHARLES H. KRAFT; DEAN COSPER; REED GALIN and TOMI JO GALIN, husband and

wife; JHM INVESTMENTS, LLC, a New Jersey limited liability company; JAMES H.

MAYNARD; JOSE O. FERNANDEZ-MIRALLES and CLARA CALBIA ORTIZ, husband and

wife; JOHN G. PALATINE and ELIZABETH J. PALATINE, husband and wife; EMANOIL C.

ROSCA and SOFYA BORT, husband and wife; JORDAN RUPERT and MYRA RUPERT,

husband and wife; GARY R. SCHEER and SUSAN W. SCHEER, husband and wife;

FRANKLIN WEINSTEIN and ELIZABETH WEINSTEIN, husband and wife; Stephen P. Boger

and JOAN BOGER, husband and wife; ROBERT DANIEL NOEY and KIMBERLY ANN NOEY, husband and wife; JOSEPH A. MAYERCHECK; PETER MOUKIOS; GEORGE KRONHEIMER; HAMMOCK 328, LLC, a Florida limited liability company; HAMMOCK 308, LLC, a Florida limited liability company; KEITH GRUBB; CARL F. RABITO; RICK T. FITZGERALD and MIRANDA F. FITZGERALD, husband and wife; RICHARD SLOAN and JENNIFER S. SLOAN, husband and wife; ROBERT STOLTZ; JAMES KANYUK; DAVID SPERA; SEAN COUCH; ROGER A. LINVILLE II; ROGER A. LINVILLE III; SALT LAKE EXCHANGE ACCOMMODATIONS, 131, LLC, a Utah limited liability company; and ALBERTINO JORGE and FABIANA JORGE, husband and wife, by and through the undersigned counsel, and sue the Defendants, GINN REAL ESTATE COMPANY, LLC, GINN-LA PINE ISLAND LTD, LLLP, CENTURY 21 PROFESSIONAL GROUP, INC., REGIONS BANK, SUNTRUST MORTGAGE, INC., FIFTH THIRD BANK, WACHOVIA BANK, N.A., and FIRST FEDERAL SAVINGS BANK OF LAKE COUNTY and state:

1.      This is an action for damages that exceed $75,000.00, exclusive of attorney's fees, interest, and costs.

2.      Venue is proper in Lake County, Florida, pursuant to Section 47.021, Florida Statutes, because one or more defendants reside in this county and the real property involved in this suit is within the territorial jurisdiction of Lake County, Florida.

<u>IDENTIFICATION OF THE PARTIES</u>

<u>PLAINTIFFS AND PROPERTIES</u>

3.      Plaintiffs AURELIO R. FELICIANO and MARIA L. VIEIRA (collectively, "FELICIANO"), husband and wife, are Florida residents who own or have owned real property in Lake County, Florida to wit:

    a.      Lot 350 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51, Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 350");

    b.      Lot 112 of BELLA COLLINA WEST, according to the plat thereof as recorded in Plat Book 54, Page 1. of the Public records of Lake County, Florida ("BELLA COLLINA WEST LOT 112"); and

    c.      Lot 108 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51. Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 108").

4.      FELICIANO purchased BELLA COLLINA LOT 350 from HERSCHEL M. VAUGN on or about May 16, 2005, for a price of $1,490,000.00.

5.      FELICIANO purchased BELLA COLLINA WEST LOT 112 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 13, 2005, for a price of $680,900.00.

6.      FELICIANO purchased BELLA COLLINA LOT 108 from GINN-LA PINE ISLAND LTD., LLLP, on or about May 28, 2004, for a price of $467,900.00.

7.      Plaintiff, MASR HOLDINGS, LLC ("MASR"), is a Delaware series limited liability company that currently holds tile to BELLA COLLINA LOT 108 and received such title from FELICIANO.

8.      MASR HOLDINGS, LLC, is wholly owned and controlled by FELICIANO, and FELICIANO is the real party in interest with regard to BELLA COLLINA LOT 108.

9.      Plaintiff, KATHLEEN TESI ("TESI"), is a Virginia resident who owns real property in Lake County, Florida to wit:

4

    a.      Lot 212 of BELLA COLLINA WEST, according to the plat thereof as recorded in Plat Book 54, Page 1, of the Public records of Lake County, Florida ("BELLA COLLINA WEST LOT 212").

10.    TESI purchased BELLA COLLINA WEST LOT 212 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 22, 2005, for a price of $655,900.00.

11.    Plaintiff, JUSTIN A. WILLIAMSON IV is a Missouri resident ("WILLIAMSON") who owns real property in Lake County, Florida to wit:

    a.      Lot 198 of BELLA COLLINA WEST, according to the plat thereof as recorded in Plat Book 54, Page 1, of the Public records of Lake County, Florida ("BELLA COLLINA WEST LOT 198").

12.    WILLIAMSON purchased BELLA COLLINA WEST LOT 198 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 13, 2005, for a price of $709,900.00.

13.    Plaintiffs, GORDON LAWRIE and MARGARET LAWRIE (collectively, "LAWRIE"), husband and wife, are foreign nationals and citizens of Scotland, United Kingdom, who own or have owned real property in Lake County, Florida to wit:

    a.      Lot 37 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51, Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 37");

    b.      Lot 352 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51, Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 352"); and

      c.     Lot 390 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51, Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 390").

14.    LAWRIE purchased BELLA COLLINA LOT 352 from GINN-LA PINE ISLAND LTD., LLLP, on or about December 8, 2004, for a price of $544,900.00.

15.    LAWRIE purchased BELLA COLLINA LOT 37 from JULIE BROGAN on or about June 8, 2005, for a price of $1,560,000.00.

16.    LAWRIE purchased BELLA COLLINA LOT 390 from HOMES BY CARMEN DOMINGUEZ, LLC, on or about May 20, 2005, for a price of $460,000.00.

17.    Plaintiff, C&G PROPERTIES II, LLC, is a Florida limited liability company that currently holds title to BELLA COLLINA LOT 352.

18.    Plaintiff, C&G PROPERTIES VI, LLC, is a Florida limited liability company that currently holds title to BELLA COLLINA LOT 37.

19.    Plaintiff, C&G PROPERTIES VIII, LLC, is a Florida limited liability company that currently holds title to BELLA COLLINA LOT 390.

20.    C&G PROPERTIES II, LLC, C&G PROPERTIES VI, LLC, and C&G PROPERTIES VIII, LLC, are companies owned by LAWRIE, and LAWRIE is the real party in interest with respect to the aforementioned properties whose titles are held by those companies.

21.    Plaintiff, Plaintiff, ALBERT DABAH ("DABAH"), is a New Jersey resident who owns real property in Lake County, Florida to wit:

      a.     Lot 296 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51, Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 296").

22.     DABAH purchased BELLA COLLINA LOT 296 from JOHN A. KOEGEL and BRADEN KOEGEL on or about June 3, 2005, for a price of $899,000.00.

23.     Plaintiff, VINCENT PREZIOSI ("PREZIOSI"), is a Florida resident who owns real property in Lake County, Florida, and St. Lucie County, Florida, to wit:

> a.    Lot 223 of BELLA COLLINA WEST, according to the plat thereof as recorded in Plat Book 54. Page 1, of the Public Records of Lake County, Florida ("BELLA COLLINA WEST LOT 223");

> b.    Lot 247 of BELLA COLLINA WEST, according to the plat thereof as recorded in Plat Book 54, Page 1, of the Public Records of Lake County, Florida ("BELLA COLLINA WEST LOT 247");

> c.    Lot 341 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51, Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 341"); and

> d.    Lot 192 TESORO PRESERVE Plat No. 2, according to the Plat thereof, as recorded in Plat Book 44, Pages 15 and 15A through 15I, of the Public Records of St. Lucie County, Florida ("TESORO PRESERVE LOT 192")..

24.     PREZIOSI purchased BELLA COLLINA WEST LOT 223 from GINN-LA PINE ISLAND LTD., LLLP, on or about July 1, 2005, for a price of $655,900.00.

25.     PREZIOSI purchased BELLA COLLINA WEST LOT 247 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 13, 2005, for a price of $709,900.00.

26.     PREZIOSI purchased BELLA COLLINA LOT 341 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 7, 2005, for a price of $784,900.00.

27.    PREZIOSI purchased TESORO PRESERVE LOT 192 from GINN-LA WILDERNESS LTD., LLLP, on or about January 14, 2005, for a price of $229,900.00.

28.    Plaintiffs, MICHAEL B. NOEL and HARRIET V. NOEL (collectively, "NOEL"), husband and wife, are Florida residents who own real property in Lake County, Florida, and St. Lucie County, Florida, to wit:

        a.    Lot 275 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51, Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 275"); and

        b.    Lot 266, TESORO PRESERVE PLAT NO. 2, according to the Plat therof, as recorded in Plat Book 44, Pages 15 and 15A through 15I, of the Public Records of St. Lucie County, Florida ("TESORO PRESERVE LOT 266").

29.    NOEL purchased BELLA COLLINA LOT 275 from GINN-LA PINE ISLAND LTD., LLLP, on or about May 26, 2004, for a price of $289,900.00.

30.    NOEL purchased TESORO PRESERVE LOT 266 from GINN-LA WILDERNESS LTD., LLLP, on or about January 14, 2005, for a price of $179,900.00.

31.    Plaintiffs, CHARLES H. KRAFT, a Tennessee resident, and DEAN COSPER, a Florida resident, (collectively, "KRAFT") own real property in Lake County, Florida, to wit:

        a.    Lot 289 of BELLA COLLINA WEST, according to the plat thereof as recorded in Plat Book 54, Page 1, of the Public Records of Lake County, Florida ("BELLA COLLINA WEST LOT 289").

32.    KRAFT purchased BELLA COLLINA WEST LOT 289 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 21, 2005, for a price of $595,900.00.

33.   Plaintiffs, REED GALIN and TOMI JO GALIN (collectively, "GALIN"), husband and wife, are Tennessee residents who own real property in Lake County, Florida, to wit:

      a.    Lot 40 of BELLA COLLINA WEST, according to the plat thereof as recorded in Plat Book 54, Page 1, of the Public Records of Lake County, Florida ("BELLA COLLINA WEST LOT 40"); and

      b.    Lot 40 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51, Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 40").

34.   GALIN purchased BELLA COLLINA WEST LOT 40 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 6, 2005, for a price of $595,900.00.

35.   GALIN purchased BELLA COLLINA LOT 40 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 7, 2004, for a price of $303,000.00.

36.   Plaintiffs, JORDAN RUPERT and MYRA RUPERT (collectively, "RUPERT"), husband and wife, are Florida residents who own real property in Lake County, Florida, to wit:

      a.    Lot 386 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51, Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 386").

37.   RUPERT purchased BELLA COLLINA LOT 386 from JOJO HERLITZ and JULIE HERLITZ, husband and wife, on or about June 9, 2005, for a price of $1,400,000.00.

38.   Plaintiffs, GARY R. SCHEER and SUSAN W. SCHEER (collectively, "SCHEER"), husband and wife, are New Jersey residents who own real property in Lake County, Florida, to wit:

a.   Lot 475, BELLA COLLINA EAST, according to the plat thereof, as recorded in Plat Book 53, Page 95, of the Public Records of Lake County, Florida ("BELLA COLLINA EAST LOT 475"); and

b.   Lot 300 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51, Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 300").

39.   SCHEER purchased BELLA COLLINA EAST LOT 475 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 13, 2005, for a price of $825,900.00.

40.   SCHEER purchased BELLA COLLINA LOT 300 from WILLIAM S. CUMMINGS, on or about June 16, 2005, for a price of $750,000.00.

41.   Plaintiff, JAMES H. MAYNARD ("MAYNARD"), is a New Jersey resident who owns real property in Lake County, Florida, and Osceola County, Florida, to wit:

a.   Lot 79 of BELLA COLLINA WEST, according to the plat thereof as recorded in Plat Book 54, Page 1, of the Public Records of Lake County, Florida ("BELLA COLLINA WEST LOT 79"); and

b.   Unit F9, CENTRE COURT RIDGE CONDOMINIUM PHASE 1, a Condominium according to the plat thereof recorded in Condominium Plat Book 9 page 55, and being further described in that certain Declaration of Condominium recorded in Official Records Book 3129 page 2558, and First Amendment to the Declaration of Condominium, Centre Court Ridge Condominium Phase 2; recorded in Official Records Book 3165, Page 194; Second Amendment to the Declaration of Condominium, Centre Court Ridge Condominium Phase 3, recorded in Official Records Book

3187, Page 2663; Third Amendment to the Declaration of Condominium, Centre Court Ridge Condominium Phase 4, recorded in Official Records Book 3187, Page 2675; Fourth Amendment to the Declaration of Condominium, Centre Court Ridge Condominium Phase 5, recorded in Official Records Book 3227, Page 268; Fifth Amendment to the Declaration of Condominium, Centre Court Ridge Condominium, Phase 6, recorded in Official Records Book 3249, Page 2388; and any and all amendments attaching thereto, all in the Public Records of Osceola County, Florida, together with an undivided interest in and to the common elements appurtenant thereto ("CENTRE COURT RIDGE UNIT F9").

42.     MAYNARD purchased BELLA COLLINA WEST LOT 79 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 17, 2005, for a price of $729,900.00.

43.     MAYNARD purchased CENTRE COURT RIDGE UNIT F9 from WIMBLEDON RIDGE, LLC, on or about August 17, 2006, for a price of $550,900.00.

44.     Plaintiff, JHM INVESTMENTS, LLC ("JHM"), is a New Jersey limited liability company that is registered to do business in Florida and owns real property in Osceola County, Florida, to wit:

     a.     Lot 256 of REUNION WEST VILLAGES NORTH, according to the Plat thereof recorded in Plat Book 16, Pages 23-31, Public Records of Osceola County, Florida ("REUNION WEST LOT 256").

45.     JHM purchased REUNION WEST LOT 256 from KARLA ATCHOO, on or about June 30, 2005, for a price of $425,000.00.

11

46. Plaintiffs, JOSE O. FERNANDEZ-MIRALLES and CLARA CALBIA ORTIZ (collectively, "FERNANDEZ"), husband and wife, are residents of Puerto Rico who own real property in Osceola County, Florida, to wit:

      a.     Lot 135 of REUNION PHASE 1, Parcel 1, Unit 1, according to the plat thereof as recorded in Plat Book 14, Pages 15-23, of the Public Records of Osceola County, Florida ("REUNION LOT 135").

47. FERNANDEZ purchased REUNION LOT 135 from NIRAJ VINOD PATEL, on or about August 31, 2005, for a price of $300,000.00.

48. Plaintiffs, JOHN G. PALATINE and ELIZABETH J. PALATINE (collectively, "PALATINE"), husband and wife, are residents of Illinois who own real property in Osceola County, Florida, to wit:

      a.     UNIT 710 of THE REUNION GRANDE CONDOMINIUM, a CONDOMINIUM being further described in that certain Declaration of Condominium recorded in Official Records Book 3379 page 1026, together with any and all amendments attaching thereto and/or therefrom, with an undivided interest in and to the common elements appurtenant thereto, all in the Public Records of Osceola County, Florida ("REUNION GRANDE UNIT 710").

49. PALATINE purchased REUNION GRANDE UNIT 710 from REUNION GRANDE, LLC, on or about June 5, 2007, for a price of $710,900.00.

50. Plaintiffs, FRANKLIN WEINSTEIN and ELIZABETH WEINSTEIN (collectively, "WEINSTEIN"), husband and wife, are residents of Maryland who own real property in Osceola County, Florida, to wit:

a.   Lot 148 of Reunion West Village 3A, according to the plat thereof as recorded in Plat Book 16, Page 136, of the Public Records of Osceola County, Florida ("REUNION WEST LOT 148"); and

b.   Unit 64, Building N, Phase 14 of SEVEN EAGLES, a Condominium at Reunion Resort and Club, and an undivided interest in the common elements thereof, and an easement of use for ingress/egress, according to the Declaration of Condominium, and amendments thereto, recorded in Official Records Book 2237 page 446, and re-recorded in Official Records Book 2370 page 1834; and Amendments to Declkaration of Condominium recorded in Official Records Book 2372 page 245, all of the Public Records of Osceola County, Florida ("SEVEN EAGLES UNIT 64").

51.   WEINSTEIN purchased REUNION WEST LOT 148 from GINN-LA ORLANDO LTD., LLLP, on or about October 15, 2004, for a price of $184,900.00.

52.   WEINSTEIN purchased SEVEN EAGLES UNIT 64 from HENRY A. MCKAY and LYNN H. MCKAY, husband and wife, on or about May 1, 2006, for a price of $610,000.00.

53.   Plaintiffs, EMANOIL C. ROSCA and SOFYA BORT (collectively, "ROSCA"), husband and wife, are residents of New York who own real property in Flagler County, Florida, to wit:

a.   Lot 32 of CONSERVATORY AT HAMMOCK BEACH, according to the Plat thereof, as recorded in Map Book 34, Pages 78 through 101, of the Public Records of Flagler County, Florida ("CONSERVATORY LOT 32").

13

54.     ROSCA purchased CONSERVATORY LOT 32 from GINN-LA HAMMOCK BEACH LTD., LLLP, on or about May 6, 2005, for a price of $369,900.00.

55.     Plaintiff, RICHARD JURKOVAC ("JURKOVAC"), is a Florida resident who owns real property in Flagler County, Florida to wit:

> a.      Lot 340 of CONSERVATORY AT HAMMOCK BEACH, according to the Plat thereof, as recorded in Map Book 34, Pages 78 through 101, of the Public Records of Flagler County, Florida ("CONSERVATORY LOT 340").

56.     JURKOVAC purchased CONSERVATORY LOT 340 from GINN-LA HAMMOCK BEACH LTD., LLLP, on or about April 25, 2005, for a price of $414,900.00.

57.     Plaintiffs, STEPHEN P. BOGER and JOAN BOGER (collectively, "BOGER"), husband and wife, are residents of Minnesota who own real property in Flagler County, Florida, to wit:

> a.      Lot 226 of CONSERVATORY AT HAMMOCK BEACH, according to the Plat thereof, as recorded in Map Book 34, Pages 78 through 101, of the Public Records of Flagler County, Florida ("CONSERVATORY LOT 226").

58.     BOGER purchased CONSERVATORY LOT 226 from GINN-LA HAMMOCK BEACH LTD., LLLP, on or about May 6, 2005, for a price of $404,900.00.

59.     Plaintiffs, ROBERT DANIEL NOEY and KIMBERLY ANN NOEY (collectively, "NOEY"), husband and wife, are residents of Florida who own real property in Flagler County, Florida, to wit:

a.      Lot 240 of CONSERVATORY AT HAMMOCK BEACH, according to

the Plat thereof, as recorded in Map Book 34, Pages 78 through 101, of the

Public Records of Flagler County, Florida ("CONSERVATORY LOT

240").

60.      NOEY purchased CONSERVATORY LOT 340 from GINN-LA HAMMOCK

BEACH LTD., LLLP, on or about April 25, 2005, for a price of $449,900.00.

61.      Plaintiff, JOSEPH A. MAYERCHECK ("MAYERCHECK"), is a Pennsylvania

resident who owns real property in Flagler County, Florida, to wit:

a.      Lot 8 of CONSERVATORY AT HAMMOCK BEACH, according to the

Plat thereof, as recorded in Map Book 34, Pages 78 through 101, of the

Public Records of Flagler County, Florida ("CONSERVATORY LOT 8").

62.      MAYERCHECK purchased CONSERVATORY LOT 8 from GINN-LA

HAMMOCK BEACH LTD., LLLP, on or about April 25, 2005, for a price of $410,900.00.

63.      Plaintiffs, PETER MOUKIOS and GEORGE KRONHEIMER (collectively,

"MOUKIOS"), are New Jersey residents who own or have owned real property in Flagler

County, Florida to wit:

a.      Lot 305 of CONSERVATORY AT HAMMOCK BEACH, according to

the Plat thereof, as recorded in Map Book 34, Pages 78 through 101, of the

Public Records of Flagler County, Florida ("CONSERVATORY LOT

305"); and

b.      Lot 328 of CONSERVATORY AT HAMMOCK BEACH, according to

the Plat thereof, as recorded in Map Book 34, Pages 78 through 101, of the

Public Records of Flagler County, Florida ("CONSERVATORY LOT 328").

64.    MOUKIOS   purchased   CONSERVATORY   LOT   305   from   GINN-LA HAMMOCK BEACH LTD., LLLP, on or about April 25. 2005, for a price of $419,900.00.

65.    MOUKIOS   purchased   CONSERVATORY   LOT   328   from   GINN-LA HAMMOCK BEACH LTD., LLLP, on or about April 25, 2005, for a price of $419,900.00.

66.    Plaintiff, HAMMOCK 308, LLC ("HAMMOCK 308"), is a Florida limited liability company that currently holds tile to CONSERVATORY LOT 305 and received such title from MOUKIOS.

67.    Plaintiff, HAMMOCK 328, LLC ("HAMMOCK 328"), is a Florida limited liability company that currently holds tile to CONSERVATORY LOT 328 and received such title from MOUKIOS.

68.    HAMMOCK 308 and HAMMOCK 328 are wholly owned and controlled by MOUKIOS, and MOUKIOS is the real party in interest with regard to CONSERVATORY LOT 305 and CONSERVATORY LOT 328

69.    Plaintiffs, KEITH GRUBB, a Texas resident, and CARL F. RABITO, a Florida resident, (collectively, "GRUBB") own real property in Lake County, Florida, to wit:

        a.    Lot 238 of BELLA COLLINA WEST, according to the plat thereof as recorded in Plat Book 54, Page 1, of the Public Records of Lake County, Florida ("BELLA COLLINA WEST LOT 238").

70.    GRUBB purchased BELLA COLLINA WEST LOT 238 from GINN-LA PINE ISLAND LTD., LLLP, on or about August 22, 2005, for a price of $709,900.00.

16

71.    Plaintiffs, RICK FITZGERALD and MIRANDA FITZGERALD (collectively, "FITZGERALD"), husband and wife, are Florida residents who own real property in Lake County, Florida, to wit:

    a.    Lot 311 of BELLA COLLINA WEST, according to the plat thereof as recorded in Plat Book 54, Page 1, of the Public Records of Lake County, Florida ("BELLA COLLINA WEST LOT 311"); and

    b.    Lot 90 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51, Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 90").

72.    FITZGERALD purchased BELLA COLLINA WEST LOT 311 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 13, 2005, for a price of $925,900.00.

73.    FITZGERALD purchased BELLA COLLINA LOT 90 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 7, 2004, for a price of $840,900.00.

74.    Plaintiff, SALT LAKE EXCHANGE ACCOMODATIONS, 131, LLC ("SALT LAKE"), is a Utah limited liability company that owns real property in lake County, Florida, to wit:

    a.    Lot 446, BELLA COLLINA EAST, according to the plat thereof as recorded in Plat Book 53, Page 95, of the Public Records of Lake County, Florida ("BELLA COLLINA EAST LOT 446").

75.    SALT LAKE purchased BELLA COLLINA EST LOT 446 from A & G ENTERPRISES, LLC, on or about June 15, 2005, for a price of $1,950,000.00.

76. Plaintiffs, RICHARD SLOAN and JENNIFER S. SLOAN (collectively. "SLOAN"), husband and wife, are Florida residents who own real property in Lee County, Florida, to wit:

      a. Lot J49. Block 3, QUAIL WEST PHASE II, UNIT 1, according to map or plat thereof as recorded in Plat Book 56, Page 69 of the Public Records of Lee County, Florida ("QUAIL WEST LOT J49")

77. SLOAN purchased QUAIL WEST LOT J49 from GINN-LA QUAIL WEST LTD., LLLP, on or about February 21, 2006, for a price of $1,120,900.00.

78. Plaintiffs, ALBERTINO JORGE and FABIANA JORGE (collectively. "JORGE"), husband and wife, are New Jersey residents who own real property in Lake County, Florida, to wit:

      a. Lot 155 of BELLA COLLINA, according to the plat thereof as recorded in Plat Book 51, Pages 31-49, of the Public Records of Lake County, Florida ("BELLA COLLINA LOT 155").

79. JORGE purchased BELLA COLLINA LOT 155 from INGER WALKER on or about June 14, 2005, for a price of $1,200,000.00.

80. Plaintiff, ROBERT STOLTZ ("STOLTZ"), is a Maryland resident who owns real property in Osceola County, Florida, and Lake County, Florida, to wit:

      a. Lot 164 of BELLA COLLINA WEST, according to the plat thereof as recorded in Plat Book 54, Page 1, of the Public Records of Lake County, Florida ("BELLA COLLINA WEST LOT 164"); and

  b. Lot 181, REUNION WEST VILLAGES NORTH, according to the Plat thereof as recorded in Plat Book 16, Page 23, Public Records of Osceola County, Florida ("REUNION WEST LOT 181").

81. STOLTZ purchased BELLA COLLINA WEST LOT 164 from GINN-LA PINE ISLAND LTD., LLLP, on or about June 13, 2005, for a price of $655,900.00.

82. STOLTZ purchased REUNION WEST LOT 181 from GINN-LA ORLANDO LTD., LLLP, on or about May 12, 2004, for a price of $174,900.00.

83. Plaintiff, JAMES KANYUK ("KANYUK"), is a Canadian resident who owns real property in St. Lucie County, Florida, to wit:

  a. Lot 112, TESORO PRESERVE Plat No. 2, according to the Plat thereof, as recorded in Plat Book 44, Pages 15 and 15A through 151, of the Public Records of St. Lucie County, Florida ("TESORO PRESERVE LOT 112").

84. KANYUK purchased TESORO PRESERVE LOT 112 from PGM BUILDERS, INC., on or about July 15, 2005, for a price of $415,000.00.

85. Plaintiff, ROGER A. LINVILLE III ("AUBREY LINVILLE"), is a North Carolina resident who owns real property in Flagler County, Florida, to wit:

  a. Lot 204 of CONSERVATORY AT HAMMOCK BEACH, according to the Plat thereof, as recorded in Map Book 34, Pages 78 through 101, of the Public Records of Flagler County, Florida ("CONSERVATORY LOT 204").

86. AUBREY LINVILLE purchased CONSERVATORY LOT 204 from GINN-LA HAMMOCK BEACH LTD., LLLP, on or about April 25, 2005, for a price of $404,900.00.

87.     Plaintiffs, DAVID SPERA and SEAN COUCH (collectively, "SPERA"), are North Carolina residents who own real property in Flagler County, Florida, to wit:

      a.     Lot 69 of CONSERVATORY AT HAMMOCK BEACH, according to the Plat thereof, as recorded in Map Book 34, Pages 78 through 101, of the Public Records of Flagler County, Florida ("CONSERVATORY LOT 69").

88.     SPERA purchased CONSERVATORY LOT 69 from GINN-LA HAMMOCK BEACH LTD., LLLP, on or about April 25, 2005, for a price of $329,900.00.

89.     Plaintiff, ROGER A. LINVILLE II ("ROGER LINVILLE"), is a North Carolina resident.

90.     ROGER LINVILLE and SPERA own real property in St. Lucie County, Florida, to wit:

      a.     Lot 39, TESORO Plat No. 4, according to the Plat thereof, as recorded in Plat Book 41, Pages 20, 20A through 20E, of the Public Records of St. Lucie County, Florida ("TESORO LOT 39").

91.     ROGER LINVILLE and SPERA purchased TESORO LOT 39 from CHARLES J. DANIELS, JR., and SHARON A. DANIELS on or about May 11, 2005, for a price of $595,000.00.

DEFENDANTS

92.     Defendant, GINN REAL ESTATE COMPANY, LLC ("GINN"), is a Georgia limited liability company qualified to transact business in the State of Florida.  At all times material hereto, GINN was employed by or affiliated with the GINN Companies, LLC, operating a development in Lake County, Florida, for the purpose of selling lots therein.

93. Defendant, GINN-LA PINE ISLAND LTD, LLLP ("GINN-PINE ISLAND"), is a Georgia limited liability limited partnership qualified to transact business in the State of Florida. At all times material hereto, GINN-PINE ISLAND was employed by or affiliated with the GINN Companies, LLC, operating a development in Lake County. Florida, for the purpose of selling lots therein.

94. Defendant, CENTURY 21 PROFESSIONAL GROUP, INC. ("CENTURY 21"), is a Florida corporation with a place of business in Ocoee, Orange County, Florida, and which regularly transacts business in Lake County, Florida.

95. Defendant, REGIONS BANK ("REGIONS"), is a foreign corporation qualified to transact business in the State of Florida, having a place of business in Lake County, Florida, and which regularly transacts business in Lake County, Florida.

96. FIFTH THIRD BANK is a successor in interest to "AmSouth Bank" and is liable for the misconduct of AmSouth Bank alleged herein.

97. Upon information and belief, Defendant, FIRST FEDERAL SAVINGS BANK OF LAKE COUNTY ("FIRST FEDERAL"), has never registered with the Florida Department of State, Division of Corporations, as a domestic corporation, a foreign corporation, or a fictitious name, but FIRST FEDERAL maintains a regular place of business in Lake County, Florida, and regularly transacts business in Lake County, Florida.

98. Defendant, SUNTRUST MORTGAGE, INC., is a foreign corporation qualified to transact business in the State of Florida, having a place of business in Lake County, Florida, and which regularly transacts business in Lake County, Florida.

99.    Defendant, WACHOVIA BANK, N.A. ("WACHOVIA"), is a foreign corporation qualified to transact business in the State of Florida, having a place of business in Lake County, Florida, and which regularly transacts business in Lake County, Florida.

100.    Defendant, FIFTH THIRD BANK, is a foreign corporation qualified to transact business in the State of Florida, having a place of business in Lake County, Florida, and which regularly transacts business in Lake County, Florida.

101.    FIFTH THIRD BANK is a successor in interest to "R-G Crown Bank" and is liable for the misconduct of R-G Crown Bank alleged herein.

102.    R-G Crown Bank lent money to the following Plaintiffs on the corresponding properties, pursuant to promissory notes and in exchange for the respective Plaintiffs executing mortgages on the respective properties to R-G Crown Bank:

    a.    FITZGERALD on BELLA COLLINA LOT 90;

    b.    MOUKIOS on CONSERVATORY LOT 305;

    c.    MOUKIOS on CONSERVATORY LOT 328;

    d.    LAWRIE on BELLA COLLINA LOT 352;

    e.    NOEL on TESORO PRESERVE LOT 266;

    f.    STOLTZ on REUNION WEST LOT 181; and

    g.    WEINSTEIN on REUNION WEST LOT 148.

103.    FIFTH THIRD BANK lent money to the following Plaintiffs on the corresponding properties, pursuant to promissory notes and in exchange for the respective Plaintiffs executing mortgages on the respective properties to FIFTH THIRD BANK:

    a.    JORGE on BELLA COLLINA LOT 155; and

    b.    SCHEER on BELLA COLLINA LOT 300.

104.   SUNTRUST MORTGAGE, INC., lent money to the following Plaintiffs on the corresponding properties, pursuant to promissory notes and in exchange for the respective Plaintiffs executing mortgages on the respective properties to SUNTRUST MORTGAGE, INC.:

   a.   BOGER on CONSERVATORY LOT 226;

   b.   JHM on REUNION WEST LOT 256;

   c.   KRAFT on BELLA COLLINA WEST LOT 289;

   d.   AUBREY LINVILLE on CONSERVATORY LOT 204;

   e.   MAYNARD on BELLA COLLINA WEST LOT 79;

   f.   PREZIOSI on BELLA COLLINA WEST LOT 223;

   g.   PREZIOSI on BELLA COLLINA WEST LOT 247;

   h.   PREZIOSI on TESORO PRESERVE LOT 192;

   i.   SCHEER on BELLA COLLINA EAST LOT 475;

   j.   SPERA on CONSERVATORY LOT 69;

   k.   SPERA and ROGER LINVILLE on TESORO LOT 39; and

   l.   TESI on BELLA COLLINA WEST LOT 212.

105.   AmSouth Bank lent money to the following Plaintiffs on the corresponding properties, pursuant to promissory notes and in exchange for the respective Plaintiffs executing mortgages on the respective properties to AmSouth Bank:

   a.   DABAH on BELLA COLLINA LOT 296;

   b.   FELICIANO on BELLA COLLINA WEST LOT 112;

   c.   FELICIANO on BELLA COLLINA LOT 350; and

   d.   RUPERT on BELLA COLLINA LOT 386.

106.   FIRST FEDERAL lent money to the following Plaintiffs on the corresponding properties, pursuant to promissory notes and in exchange for the respective Plaintiffs executing mortgages on the respective properties to FIRST FEDERAL:

    a.    FELICIANO on BELLA COLLINA LOT 108;

    b.    NOEL on BELLA COLLINA LOT 275; and

    c.    PREZIOSI on BELLA COLLINA LOT 341.

107.   WACHOVIA lent money to the following Plaintiffs on the corresponding properties, pursuant to promissory notes and in exchange for the respective Plaintiffs executing mortgages on the respective properties to WACHOVIA:

    a.    GRUBB on BELLA COLLINA WEST LOT 238; and

    b.    WILLIAMSON on BELLA COLLINA WEST LOT 198.

108.   BANK OF AMERICA lent money to the following Plaintiffs on the corresponding properties, pursuant to promissory notes and in exchange for the respective Plaintiffs executing mortgages on the respective properties to BANK OF AMERICA:

    a.    FERNANDEZ on REUNION LOT 135;

    b.    GALIN on BELLA COLLINA WEST LOT 40;

    c.    KANYUK on TESORO PRESERVE LOT 112;

    d.    MAYERCHECK on CONSERVATORY LOT 8;

    e.    PALATINE on REUNION GRANDE UNIT 710;

    f.    ROSCA on CONSERVATORY LOT 32;

    g.    STOLTZ on BELLA COLLINA WEST LOT 164; and

    h.    WEINSTEIN on SEVEN EAGLES UNIT 64.

109.   GINN FINANCIAL, LLC, lent money to the following Plaintiffs on the corresponding properties, pursuant to promissory notes and in exchange for the respective Plaintiffs executing mortgages on the respective properties to GINN FINANCIAL, LLC:

     a.    SLOAN on QUAIL WEST LOT J49.

110.   BRANCH BANKING AND TRUST COMPANY ("BB&T") lent money to the following Plaintiffs on the corresponding properties, pursuant to promissory notes and in exchange for the respective Plaintiffs executing mortgages on the respective properties to BB&T:

     a.    JORKOVAC on CONSERVATORY LOT 340; and

     b.    NOEY on CONSERVATORY LOT 240.

111.   BB&T also took an assignment of a note and mortgage from GINN FINANCIAL, LLC, with regard to the following Plaintiffs and properties:

     a.    SLOAN on QUAIL WEST LOT J49.

112.   LEHMAN BROTHERS BANK lent money to the following Plaintiffs on the corresponding properties, pursuant to promissory notes and in exchange for the respective Plaintiffs executing mortgages on the respective properties to LEHMAN BROTHERS BANK:

     a.    MAYNARD on CENTRE COURT RIDGE UNIT F9.

113.   Upon information and belief, AURORA LOAN SERVICES, LLC, now possesses the promissory note and mortgage for the following Plaintiffs on the following properties:

     a.    MAYNARD on CENTRE COURT RIDGE UNIT F9.

114.   MERCANTILE BANK lent money to the following Plaintiffs on the corresponding properties, pursuant to promissory notes and in exchange for the respective Plaintiffs executing mortgages on the respective properties to MERCANTILE BANK:

     a.    LAWRIE on BELLA COLLINA LOT 37.

115.   RBC CENTURA BANK lent money to the following Plaintiffs on the corresponding properties, pursuant to promissory notes and in exchange for the respective Plaintiffs executing mortgages on the respective properties to RBC CENTURA BANK:

a.   GALIN on BELLA COLLINA LOT 40.

116.   WACHOVIA, BANK OF AMERICA, REGIONS, MERCANTILE BANK, BB&T, GINN FINANCIAL, LLC, FIRST FEDERAL, FIFTH THIRD BANK, RBC CENTURA BANK, and SUNTRUST MORTGAGE, INC., will be collectively referred to as "PREFERRED LENDERS".

<u>COMMON ALLEGATIONS</u>

117.   At all times material hereto, Defendant GINN-PINE ISLAND acted individually and as an agent, servant, employee, partner and joint venturer, or one or more of them, of Defendant GINN within the course and scope of its employment or relationship and with the permission and consent of Defendant GINN, which is vicariously liable for the acts of its agents, employees, partners and/or joint venturers.

118.   Pursuant to Sections 475.01(1)(a) and (1)(j), Florida Statutes, a real estate "broker" and a "sales associate" each "renders a professional service and is a professional".

119.   At all times material hereto, Defendant GINN was a broker or sales associate within the definitions of Sections 475.01(1)(a) and (1)(j), Florida Statutes.

120.   At all times material hereto, GINN was licensed to (and did) offer professional real estate brokerage services to the Florida public.  Pursuant to Sections 621.051 and 475.01, Florida Statutes, GINN is a professional service limited liability company.

121.   Pursuant to Section 621.07, Florida Statutes, and the common law of Florida, GINN is liable "for any negligent or wrongful acts or misconduct committed by any of its

officers, agents, members, managers, or employees while they are engaged on behalf of the corporation or limited liability company in the rendering of professional services."

122.   The conduct of GINN complained of in this Complaint was done by its officers, agents, members, managers, or employees while they were engaged on behalf of GINN in the rendering of professional services.

123.   GINN provided real estate services in connection with each and every real property purchase identified in paragraphs 3 through 91.

124.   Defendant, CENTURY 21, is vicariously liable for the acts of its agents, employees, partners and/or joint venturers.

125.   At all times material hereto, Defendant CENTURY 21 was a broker or sales associate within the definitions of Sections 475.01(1)(a) and (1)(j), Florida Statutes.

126.   At all times material hereto, CENTURY 21 was licensed to (and did) offer professional real estate brokerage services to the Florida public. Pursuant to Sections 621.05 and 475.01, Florida Statutes, CENTURY 21 is a professional service corporation.

127.   Pursuant to Section 621.07, Florida Statutes, and the common law of Florida, CENTURY 21 is liable "for any negligent or wrongful acts or misconduct committed by any of its officers, agents, members, managers, or employees while they are engaged on behalf of the corporation or limited liability company in the rendering of professional services."

128.   The conduct of CENTURY 21 complained of in this Complaint was done by its officers, agents, members, managers, or employees while they were engaged on behalf of CENTURY 21 in the rendering of professional services.

<u>BELLA COLLINA</u>

129.   "Bella Collina" is a land development project located in Lake County, Florida.

130.   The entities associated with the "Bella Collina" land development project include, but are not limited to, Bella Collina, LLC; The Bella Collina Club, LLC; GINN Bella Collina Golf, LLC; and Bella Collina Property Owner's Association, Inc.

131.   Upon information and belief, GINN is associated and affiliated with those business entities identified in the preceding paragraph as well as with GINN Property Management, LLC, and GINN Development Company, LLC.

132.   Upon information and belief, the principals behind the Bella Collina land development project are GINN, The GINN Company, GINN-PINE ISLAND, or one or more affiliates of the preceding.

133.   GINN is closely affiliated with and related to other entities, including but not limited to GINN-PINE ISLAND, such that they are alter egos of each other. Such other entities include but are not limited to: A&G Enterprises, LLC; Bella Collina Master Association, Inc.; Bella Collina Property Owners Association, Inc.; The GINN Companies, LLC; GINN Development Company, LLC; GINN Development International, LLC; GINN Financial Group, Inc.; GINN Financial Services, LLC; GINN Golf, LLC; GINN Hospitality, LLC; GINN Property Management, Inc.; GINN Property Management, LLC; GINN Resort Management, LLC; GINN Sports Entertainment, LLC; GINN Tesoro Golf, LLC; GINN-LA Ballyhoo Ltd., LLLP; GINN-LA Battle One Ltd., LLLP; GINN-LA Battle Two Ltd., LLLP; GINN-LA Bulow Ltd., LLLP; GINN-LA Burski Ltd., LLLP; GINN-LA Gladys Fork Ltd., LLLP; GINN-LA Hammock Beach Ltd., LLLP; GINN-LA Hutchinson Ltd., LLLP; GINN-LA Laurel Creek Ltd., LLLP; GINN-LA Naples Ltd., LLLP; GINN-LA OBB Ltd., LLLP; GINN-LA Orlando Ltd., LLLP; GINN-LA Palm Beach Gardens Ltd., LLLP; GINN-LA Parkers Island Ltd., LLLP; GINN-LA Patriots Point Ltd., LLLP; GINN-LA Pine Island Ltd., LLLP; GINN-LA Promenade Ltd., LLLP; GINN-LA

Quail West Ltd., LLLP; GINN-LA St. Lucie Ltd., LLLP; GINN-LA USVI Golf, LLLP; GINN-LA West End Ltd., LLLP; GINN-LA Wilderness Ltd., LLLP; GINN-LA WSL Ltd., LLLP; GINN Sur Mer Club, Ltd.; Hammock Beach River Club, LLC; Hammock Beach Resort Management, LLC; Hammock Beach II, LLC; Hammock Beach III, LLC; Hammock Beach Property Owners Association, Inc.; Hammock Beach Discovery Center, LLC; Hammock Beach Resort Co., LLC; Harbor Village Marina Property Owners Association, Inc.; Northshore Hammock Ltd., LLLP; Ocean Hammock Homeowners Association, Inc.; Reunion Resort & Club of Orlando Master Association, Inc.; Reunion Grande, LLC; Wimbledon Ridge, LLC; Reunion Resort Management, LLC; Tesoro Beach Club Condominium, LLC; Tesoro Club, LLC; Tesoro Golf Club Condominium, LLC; Tesoro Property Owners' Association, Inc.; Tesoro Preserve Property Owners Associations, Inc.; The Bella Collina Club, LLC; The Conservatory Property Owner's Association, Inc.; The Gardens At Hammock Beach Property Owners' Association, Inc.; The Hammock Beach Estates Home Owner's Association, Inc.; and The Reunion Club of Orlando, LLC.

134.    The entities identified in paragraphs 130 through 133, above, share officers and directors, employees, offices, and assets interchangeably and without regard to corporate structure.

135.    The entities identified in paragraphs 130 through 133, above, are sham corporations that exist and were established to defraud and mislead the public, avoid statutory requirements, and to benefit and profit from each other by abusing the laws.

136.    GINN or The GINN Company have authority, dominion, and control over the other entities identified in paragraphs 130 through 133, above.

137.    The entities identified in paragraphs 130 through 133, above, are closely affiliated and related entities such that they are alter egos of one another.

## GINN'S MARKETING SCHEME OR DEVICE

138.    The GINN Company is a parent company of a number of subsidiaries that collectively form the company which is a close network of investors located in various portions of the world that act as a single enterprise offering customers a wide variety of condominium units and vacant lots and a choice of locale in which to purchase those condominium units and vacant lots.

139.    The GINN Company is a resident of the State of Georgia which operates through its Company as well as several Affiliated Entities including GINN Real Estate Company, GINN-LA Wilderness Ltd., LLLP, GINN-LA Hammock Beach Ltd., LLLP, GINN-LA Orlando Ltd., LLLP, or GINN-LA Pine Island Ltd., LLLP (collectively referred to as "Affiliated Entities") by selling condominium units and vacant lots to Purchasers. (Tesoro Preserve Homeowners Association, Inc., Tesoro Club, LLC, The Conservatory Property Owner's Association, Inc., Ocean Hammock Homeowner's Association, Inc., Harbor Village Marina Property Owner's Association, Inc., Bella Collina Master Association, Inc., Bella Collina Property Owners Association, Inc., and Reunion Resort & Club of Orlando Master Association, Inc., The Reunion Club of Orlando, LLC, The Bella Collina Club, LLC, Tesoro Property Owners' Association, Inc., Tesoro Golf Club Condominium, LLC, Tesoro Beach Club Condominium, LLC, The Gardens at Hammock Beach Property Owners' Association, Inc., Hammock Beach River Club, LLC, Hammock Beach Resort Management, LLC, Hammock Beach II, LLC, Hammock Beach III, LLC, The Hammock Beach Estates Home Owner's Association, Inc., Hammock Beach Property Owners Association, Inc., Hammock Beach Discovery Center, LLC, Hammock Beach

Resort Co., LLC, are also referred to herein sometimes as "Associations" and sometimes as "Affiliated Entities").

140.    Prospective Purchasers, many of whom resided outside of Florida, were solicited by GINN and GINN Real Estate Agents via mail, email, and telephone to purchase real estate ("Lots") in Florida.

141.    Upon information and belief, GINN-LA Wilderness Ltd., LLLP, GINN-LA Hammock Beach Ltd., LLLP, GINN-LA Orlando Ltd., LLLP, or GINN-LA Pine Island Ltd., LLLP are developments in excess of 500 Lots each, together with certain unimproved land, situated in various Counties in the State of Florida.

142.    GINN COMPANY, LLC, GINN-LA Wilderness Ltd., LLLP, GINN-LA Hammock Beach Ltd., LLLP, GINN-LA Orlando Ltd., LLLP, and GINN-LA Pine Island Ltd., LLLP ("Developers") are "developers" as defined under the "Interstate Land Sales Full Disclosure Act" ("ILSA"), Title 15 United States Code 1701 et seq.

143.    GINN Real Estate Agents and Brokers, through GINNs' Affiliated Entities, marketed, solicited, promoted and sold various properties to prospective Purchasers, including Plaintiffs.

144.    Upon information and belief, the GINN Real Estate Company was set up for the exclusive purpose of continuing the stream of sales and purchases without complying with the ILSA disclosure requirements.

145.    To circumvent ILSA disclosure requirements and create more profits for its investors, in the form of a commission, GINN, through its Real Estate Company would solicit, list and sell properties multiple times.  In essence, GINN would create more sales using unsuspecting Purchasers and sellers thereby evading the ILSA disclosure requirements.

146.   GINN Real Estate Agents and brokers would call prospective Purchasers and state that as soon as a property was purchased, the agents could immediately sell the properties at a substantial profit.

147.   After GINN's scheme began to reach its peak, GINN agents began using the listed sales prices of former Purchasers' properties as "bait" to lure other prospective Purchasers away from the former Purchasers' properties to properties owned and held by GINN (or its officers, agents, affiliates, subsidiaries, or employees) by demonstrating to the prospective Purchaser that GINN could offer a substantially reduced price in comparison to those prices being offered for former Purchasers' properties.

148.   Prospective Purchasers, including Plaintiffs, were lured with grand marketing materials promoting GINN's properties which would often be sent via federal express to the prospective Purchasers.

149.   GINN would require that due to overwhelming early demand for Lots within the development, the only way prospective Purchasers could obtain the right to purchase a Lot would be to do so by using a power of attorney that was selected by GINN.

150.   GINN established a relationship with a firm named Cameron, Davis and Gonzales who would act as an agent to prospective Purchasers, pursuant to a power of attorney while in fact Cameron, Davis and Gonzales acted in concert with and aided and abetted GINN.

151.   Upon information and belief, using a power of attorney was a scheme to circumvent ILSA disclosure requirements.

152.   The power of attorney instrument was not specific to any particular real estate but gave the agent acting as the power of attorney the right to secure real estate and sign a purchase agreement on behalf of the prospective Purchaser if the prospective Purchaser was awarded a

property by GINN through purported "lottery" type events, which GINN commonly referred to as "reservation selection events".

153.   Once the prospective Purchaser was awarded a property by GINN at what GINN called a "property launch" or "reservation selection event", Cameron, Davis & Gonzalez would sign a purchase agreement and mail the prospective Purchaser an executed purchase agreement.

154.   Cameron, Davis & Gonzalez throughout its representation of the prospective Purchasers acted in conflict of the interest of the prospective Purchaser since Cameron, Davis & Gonzalez acted as power of attorney, escrow agent, and closing agent all at the same time for each of the transactions—thereby assisting GINN in its scheme.

155.   GINN was aware that Purchasers/owners wanted to list and sell or rent their properties before the purchases occurred.

156.   Upon information and belief, the Associations were established by GINN and are fully controlled by GINN or GINN Affiliated Entities.

157.   The Associations are another method by which GINN obtains money from unsuspecting Purchasers to further GINN's scheme.

158.   The Associations charge membership fees, golf fees, and other fees when in fact several developments to date lack services and basic necessities and amenities that were promised by GINN such as roads, water, and sewer, landscaping, golf courses, club houses, etc.

159.   When Purchasers refused to pay the fees demanded by the Associations because the Purchasers had not received any of the benefits which were to be provided by GINN under the Purchase Agreements, the Associations use the judicial process and seek to foreclose on the Purchasers' properties thereby coercing Plaintiffs into payment due to the risk of losing the property altogether.

160.    In furtherance of the coercion of the Purchasers under the scheme, GINN refuses to accept listings from owners wishing to sell their lots on the basis that the owners have not paid their fees to the Associations.

161.    GINN also established golf and social clubs within each development.

162.    Upon information and belief, the golf and social clubs were established by GINN, with each club bearing the name of a different business entity and being operated by other GINN entities while they are fully controlled by GINN.

163.    GINN marketed its developments as "resorts" that would have golf and social clubs, water parks, equestrian stables, and other entertainment and attraction facilities to induce prospective purchasers to buy GINN properties as investments which would produce rental income or would sharply increase in value as such entertainment and attraction facilities were completed.

164.    The golf and social clubs are another method by which GINN obtains money from unsuspecting Purchasers, artificially inflates property values, and lures unsuspecting purchasers to buy properties in GINN developments in furtherance of GINN's scheme.

165.    GINN also made false representations to purchasers regarding the Lots, including, but not limited to, informing unsuspecting purchasers that golf and/or social memberships in golf and social clubs owned and operated by various GINN entities, affiliates, and associations transferred or "ran with the deed" or "ran with the land" to the Lots, indicating that a purchaser would inherit a prior owner's membership upon the purchase.

166.    After purchasing properties from or through GINN, such purchasers would be told that they needed to pay membership "deposits" of $10,000 or more to GINN before they would obtain membership status, that GINN would no longer be offering membership status to any

owners, that if an owner lost his or her membership status they could only obtain membership by purchasing another property in the same GINN development, and that GINN knew of owners who had actually purchased additional properties to obtain membership status.

167.   GINN unilaterally determined to cease offering memberships before the membership facilities were completed, thereby coercing owners to secure memberships and pay membership fees before such owners could inspect or review or use membership facilities.

168.   In furtherance of the coercion of the Purchasers under the scheme, GINN refuses to accept rental or sales listings from owners wishing to rent or sell their lots if such owners did not secure membership in the golf or social clubs or if they were delinquent on their fees or dues for same.

169.   Owners were prohibited from renting their properties themselves by the declarations relating to the properties.

170.   GINN refused to provide prospective purchasers with copies of the property declarations or an opportunity to review them before accepting a purchase offer.

171.   In addition, GINN fraudulently induced Purchasers to sign waiver or disclosure affidavits that indicated GINN had supplied the Purchasers with copies of Homeowners' Association, property declaration, and other documents, when GINN refused to supply such documents to the Purchasers before the Purchasers signed the affidavits and GINN refused to present purchase offers until the prospective purchasers signed such affidavits.

172.   Once membership facilities were completed, GINN would issue "GINN cards" to owner/members and would only accept those cards as payment at such clubs.

173.   A "GINN card" would only be issued to a non-owner if the owner agreed to use GINN to manage and rent the property.

174.   The "GINN cards" were a way of coercing owners to rent their properties through GINN or a GINN affiliate.

175.   A renter of any owner who did not use GINN to rent his or her property would not be able to pay for products or services at GINN facilities unless the owner agreed to allow the renter to use the owner's card, making the owner personally liable for any and all charges the renter might expense to the GINN card.

176.   GINN charged excessive property management rates for renting or leasing GINN properties, and GINN could charge such rates because then and only then would an additional GINN card be issued for a renter, thereby relieving the owner of personal liability for the renter's charges.

177.   Moreover, the rules and bylaws of GINN's golf and social clubs provided that such clubs were entitled to a percentage of any rental of the member/owner's property, the percentage was to be unilaterally set by the clubs owned and controlled by GINN, and could be changed at any time without the necessity of putting the rates to a membership vote.

178.   Additionally, GINN failed to complete or construct the entertainment and attraction facilities that were initially represented to purchasers to be part of the "resort".

179.   GINN's marketing of the properties to prospective purchasers as investment/rental properties was fraudulent because marketing the developments as "resorts", failing to complete the resort facilities and attractions, the GINN cards, and the property declarations precluded owner's from renting the properties or forced them to rent through GINN which made rentals economically infeasible or impracticable as a majority of any rental income would be redirected to GINN's various entities through GINN's scheme or device.

180.     GINN and various GINN Affiliated Entities always stated that the properties initially owned by GINN in each development were sold at the property launches and represented that they had no excess inventory of properties.

181.     After GINN closed on properties sold during a property launch, GINN would then release more properties in a subsequent launch and price such properties substantially below properties in the development offered by other sellers.

182.     GINN did list some properties for sale that were not owned by GINN or its agents, employees, officers, partners, or executives when the owners of such Properties were current on their association, golf, and club fees. ("Resale Properties")

183.     The prices for the Resale Properties were substantially higher than the prices for GINN properties that were either currently listed or which would be offered through subsequent GINN Property Launches.

184.     Although GINN represented that they would merely be acting as transaction brokers with regard to the listing and sale of the Resale Properties, GINN advised, recommended, and set the list prices of such properties as well as the commissions offered to the listing agents or brokers and cooperating agents or brokers, and GINN did so while it withheld material information regarding local market conditions, such as the prices of other comparable properties that were for sale or had recently sold, the average list times for such properties, and the commissions being offered to GINN, as the listing agent or broker, and cooperating agents or brokers.

185.     Upon information and belief, GINN offered its agents and brokers and cooperating agents or brokers substantially higher commissions or commission rates to sell GINN properties than were offered for the Resale Properties listed by GINN.

37

INTERSTATE LAND SALES ACT

186.     Pursuant to Section 1707 of ILSA, as required by Section 1703(a)(1)(B), Defendants, when engaged in interstate commerce, are required to provide all prospective Purchasers with a detailed property report containing specific information about the property contained in a development prior to the execution of a purchase agreement.

187.     Plaintiffs herein have never received in advance from GINN, any other defendant, or any other person, with respect to the property they purchased, a property report meeting the requirements of Section 1707 of ILSA, as required by Section 1703(a)(1)(B).

188.     To circumvent ILSA, GINN would often sell its properties between or among its various affiliated companies or would sell the properties to its own officers, executives, agents, and employees without providing the necessary property report and such related persons would then resell the property to a person not affiliated with GINN.

189.     During the property launches, in an attempt to induce Plaintiffs to purchase properties, GINN Real Estate agents and brokers would give some prospective Purchasers tours of the Lots and would make representations regarding how much certain Purchasers paid for certain Lots and the amount of gain those individuals enjoyed and the short period of time in which the gain was realized.  Upon information and belief, such representations were false because the amounts stated were incorrectly high or such properties had not in fact been sold as represented, and such statements were made knowingly by GINN's agents or employees.

190.     This method was also used to induce prospective Purchasers, who were not awarded a property at a property launch, to purchase Lots listed with the GINN Real Estate Company.

191. On several occasions GINN Real Estate agents would call prospective Purchasers with the enticement that a Lot had just become available and that the agents could immediately resell ("flip") the Lots at a significant profit immediately for and on behalf of the prospective Purchasers.

192. The brokers offered these lots pursuant to a common promotional plan under the same or similar sounding names or identities with common sales agents, common sales facilities and common advertising. As a result, the brokers were required to comply with the requirements of ILSA even when they sold lots for people other than the developer itself.

## SECURITIES AND EXCHANGE COMMISSION

193. GINN and its agents knew or had reason to know that the only reason these Lots were being purchased by prospective Purchasers, including Plaintiffs, was for investment.

194. Prospective Purchasers, including Plaintiffs, relied on GINN and GINN's Affiliated Entities in that the affiliates or others would be able to resell the Lots and that the prospective Purchasers could expect profits solely from the efforts of GINN and its affiliates who marketed, advertised, and sold the Lots.

195. In essence, GINN has developed a multiple-tiered pyramid marketing scheme, which involves the use of offshore and United States entities and individuals in a joint venture to solicit and compensate investors in various related enterprises.

196. The instruments used to facilitate the scheme were vacant lots and condominiums purchased for investment purposes by second and third-tier individuals such as Plaintiffs.

197. Based on representations made in furtherance of its scheme, GINN, its sales representatives, its agents and its affiliates including all other Defendants, misled prospective Purchasers, including Plaintiffs, to believe that if the Purchasers purchased Lots in the GINN

developments, the Purchasers could immediately resell the units and realize substantial profits or immediately rent the condominiums, or houses to be built on the lots, with a positive cash flow after accounting for the expense of ownership including but not limited to association and club fees, taxes, insurance, property management fees, and mortgage payments.

## "PONZI SCHEME"

198.   Upon information and belief, all GINN Affiliated Entities were set up and run for the exclusive purpose of raising money from unsuspecting Purchasers, like Plaintiffs, for the benefit of GINN and GINN Affiliated Entities.

199.   Upon information and belief, GINN created a complicated maze of companies to be used in marketing, soliciting, and promoting properties to potential Purchasers to avoid the scrutiny of U.S. regulators including the Securities and Exchange Commission, while at the same time perpetuating a "Ponzi Scheme" in which returns to investors were not financed through the success of the underlying business venture, but were taken from principal sums of newly attracted Purchasers, such as Plaintiffs.

200.   Prospective Purchasers, including Plaintiffs, were promised large returns for their investments by GINN.

201.   Initial Purchasers were actually paid the promised returns, which attracted additional Purchasers, including Plaintiffs.

202.   GINN set up a regularly operating business whose purpose was to lure prospective Purchasers, including Plaintiffs, into the scheme knowing that the Lots being sold were never worth the purchase price paid by those Purchasers.

203.   Defendants understood that the second- and third-tier Purchasers, who were the Purchasers that were actually paid the promised returns, were used by GINN for the exclusive

purpose of marketing and promoting future fraudulent sales to other Purchasers, including Plaintiffs, and similarly situated individuals.

204.   Nevertheless, from the beginning, Defendants through the developments they controlled made substantial transfers and sales of properties, which resulted in new investor funds being used by Defendants to pay returns to old investors.

205.   Defendants created the multiple-tiered marketing scheme by, among other things, representing to prospective Purchasers, including Plaintiffs, and similarly situated persons that the profits being realized by investors was legitimate, and Defendants actively encouraged individuals to purchase properties in GINN Developments.

206.   Given its intimate knowledge of the multiple-tier marketing scheme, GINN and its affiliates knew that more property was being purchased, sold and resold, then should have been in a development that GINN claims was developed for "end-users" and not "investors".

207.   Despite actual or constructive knowledge of the fraudulent nature of the marketing scheme, GINN and its affiliates, through the GINN Real Estate Company, continued in marketing the scheme and selling Lots to Purchasers, including Plaintiffs, which resulted in new Purchasers being used by GINN and its affiliates to pay returns to old investors.

208.   Upon information and belief, in promoting the scheme, GINN brought in several of its associates to purchase property for an inflated and manufactured value. These manufactured purchase prices created a false and deceptive basis in the price for the properties. This false and deceptive basis in the price of the property permitted licensed appraisers to create inaccurate appraisal values for the properties. These inaccurate appraisals induced lenders to grant loans secured by the properties while in fact the properties were worth significantly much

less than their appraisals. When lenders realized that the properties had an inflated value, the lenders stopped issuing loans on these properties.

209.   In furtherance of the "Ponzi Scheme", some Purchasers were referred by GINN to Suntrust Bank to obtain financing in order to purchase properties. Upon information and belief, at that time, Edward R. "Bobby" Ginn, was on the board of directors of Suntrust Bank.

210.   Upon information and belief, Mr. Ginn, using his influence as a director of Suntrust Bank, made it easier for the initial Purchasers to obtain financing knowing that the appraisals were inaccurate and manufactured.

211.   Suntrust Bank knew or should have known that GINN was engaged in a "Ponzi Scheme" especially since the properties were substantially increasing in value in a relatively short period of time and then being resold and financed through Sun trust Bank for hundreds of thousands of dollars more than the properties were initially purchased for less than a few months before.

212.   Once GINN sold enough Lots and other lenders began financing properties based upon the appraisals and the past loan history with Suntrust Bank.

213.   Then, Suntrust Bank, with full knowledge of the "Ponzi Scheme" ceased to finance any future Purchasers knowing that the prices were inflated and knowing that the GINN real estate market would soon collapse.

214.   GINN also referred prospective Purchasers, including Plaintiffs, to use GINN's "preferred lenders" to finance the transactions.

215.   GINN's preferred lenders included, but were not limited to, Suntrust Bank, Suntrust Mortgage, Inc., AmSouth Bank, First Federal Savings Bank of Lake County, Fifth Third Bank, "R-G Crown Bank", Wachovia Bank, N.A., GINN Financial Group, Inc., BB&T, RBC

CENTURA BANK, BANK OF AMERICA, REGIONS, MERCANTILE BANK, and GINN Financial Services, LLC.

216.    With full knowledge of GINN's Ponzi Sceme and GINN's Marketing Scheme, the preferred lenders conspired with GINN to further GINN's schemes.

217.    With full knowledge of GINN's Ponzi Sceme and GINN's Marketing Scheme, the preferred lenders engaged in unlawful and inequitable conduct, including, but not limited to:

    a.    Directing Purchasers to falsify loan applications and documents;

    b.    Making false representations to Purchasers regarding loan programs, for example, by informing the Purchasers that certain loan programs were only available to foreign national—in violation of the Equal Credit Opportunity Act;

    c.    Failing to provide Associated Business Arrangement Disclosures to all buyers in violation of the Real Estate Settlement Procedures Act;

    d.    Providing false and misleading information to Purchasers in violation of the Truth in Lending Act;

    e.    Providing illegal referral fees and kickbacks to realtors, appraisers, and other settlement professionals in violation of the Real Estate Settlement Procedures Act;

    f.    Failing to provide adequate and timely disclosures in violation of the Real Estate Settlement Procedures Act;

    g.    Issuing loans to persons who had no sales contract to purchase real estate or who had not signed such;

h.    Failing to obtain signed acknowledgements and other documents in accordance with RESPA requirements;

i.    Obtaining security interests in the Lots by fraud, willful misrepresentations of future acts, and/or false promises, for example, by informing Purchasers that they could automatically obtain a future construction loan to build a residence on the Lots without the Purchaser having to obtain or contribute additional equity to the Property;

j.    Conspiring to commit forgery;

k.    Failing to timely provide purchasers with appraisal reports—in violation of the Equal Credit Opportunity Act; and,

l.    Hiring appraisers and appraisal companies to perform, and who did in fact perform, negligent, false, and fraudulent appraisals.

218.    The appraisers and appraisal companies which performed negligent, false, and fraudulent appraisals include, but are not limited to, AFL APPRAISALS, LLC, f/k/a AMERICAN APPRAISALS OF FLORIDA, LLC, DIANA LYNNE DAVID, and JULIE E. CHARTIER.

219.    In certain communities, such as Reunion, GINN had a duty to disclose and failed to disclose to prospective Purchasers that the Lots were located within a Community Development District which had not levied any property taxes or assessments on the Lots at the time of the transaction and whose existence was not readily apparent to the Purchasers.

220.    GINN also made representations to prospective Purchasers that certain developers would construct residences on the Lots and enter automatically enter into build-leaseback arrangements wherein the builder would simultaneously enter into an agreement to construct a

residence and an agreement to lease the residence back from the owner when construction was completed.

221.   In connection with GINN's build-leaseback representations, GINN told prospective Purchasers that GINN's preferred lenders would not require additional capital from owners who entered into build-leaseback agreements.

222.   However, GINN failed to inform prospective Purchasers that such build-leaseback arrangements were conditioned upon the property owners securing and maintaining golf memberships from GINN's Associations and that the Associations were entitled to a percentage of any lease arrangement for a member-owner's property, with said percentage to be determined unilaterally by the Association without membership approval and said percentage being subject to change at the sole discretion of the Association.

223.   GINN knew that its actions would induce other people to purchase properties, thereby generating billions of dollars in investment capital and lining the pockets of GINN and GINNs affiliates in classic Ponzi fashion.

224.   When marketing properties within a particular GINN community, GINN Real Estate Agents and brokers would inform prospective Purchasers about "successful" real estate market activity and history of properties in other GINN communities, such as rapid and sustained sales price increases and rapid times from list date to sale date; thereby using the artificial conditions and prices GINN created in earlier communities to induce the same artificial conditions and inflated sales prices in subsequent communities.

225.   GINN regularly sent agents to states outside of Florida to solicit Purchasers for their developments. GINN officials began to market the Multiple-Tier Marketing Scheme to these Purchasers and potential Purchasers making the representations of quick profits.

226.    Given GINN's involvement in the Multiple-Tier Marketing Scheme, GINN knew or should have known that these transactions were completely inconsistent with a legitimate business practice and were wholly consistent with a Ponzi Scheme and fraud scheme since there was no possibility of any value being added to the property by GINN and since the property values were already ridiculously over-inflated.

227.    GINN continued with the acts of selling properties to the second-tier and third-tier Purchasers to satisfy GINN's Affiliated Entities.

228.    GINN's actions perpetuated the Ponzi scheme by ensuring that old investors were paid timely and strengthened the Ponzi scheme by enhancing the track record of the company by having a high turnover with significant profits.

GINN'S MARKETING

229.    Through its agents, employees and affiliates, GINN employed planned tactics to purposefully create an illusion of fierce demand and scarce supply for the Bella Collina properties and properties in other GINN developments ("GINN's Marketing Scheme").

230.    As part of GINN's Marketing Scheme, GINN utilized unique promotional activities to attract real estate buyers, such as:

    a.    arranging and paying for "five-star" resort accommodations (which cost approximately $630 per night) for such buyers;

    b.    paying for food, drinks, and meals of such buyers;

    c.    organizing roll-out or property launch days;

    d.    holding pre- launch-day events and free parties at resort and development locations;

    e.    providing free helicopter rides, and;

      f.      providing free recreational activities for both adults and children.

231.   The activities identified in the preceding paragraph were employed by GINN to attract primarily out-of-state potential buyers to purchase real estate in GINN Developments.

232.   As part of GINN's Marketing Scheme. GINN pre-selected and solicited a significant number of out-of-state persons to become buyers of real estate in GINN Developments.

233.   A majority of persons who purchased property from GINN in the various GINN development communities in Florida, were domiciled outside the state of Florida when such purchases occurred.

234.   GINN's Marketing Scheme was also designed to provide buyers little or no time to make informed decisions as to real estate purchase transactions.

235.   GINN agents and representatives contacted prospective purchasers and developed relationships with them over the course of several months, and such communications included mail, electronic mail, and telephone communications.

236.   GINN agents and representatives offered prospective purchasers to "reserve" a right to purchase a GINN property through "Priority Reservation Selection Events".

237.   GINN would then send prospective purchasers who accepted or made such reservations a Reservation Confirmation package which told purchasers that they had to

      a.  execute a power of attorney form;

      b.  disclose their personal financial information to GINN, including but not limited to providing a pre-approval letter from a lender stating the maximum amount of loan they would qualify for;

      c.  fill out other forms;

d. select GINN properties to be purchased, and;

e. authorize GINN or its affiliates to purchase one or more GINN properties for them through GINN's Priority Reservation Selection Event on a specified date.

238.  Plaintiffs completed the documents in the Reservation Confirmation, including the Power of Attorney form, and returned those completed documents to GINN.

239.  The Reservation Confirmation documents sent to Plaintiffs did not include a Brokerage Relationship Disclosure Form.

240.  When GINN requested Plaintiffs to empower GINN or its affiliates to purchase property for them, GINN knew or should have known that:

a. Plaintiffs had never visited said properties;

b. Plaintiffs did not have any opportunity to visit the properties being offered because they did not live in Florida, and;

c. Plaintiffs did not have information about the various properties through which they could make an informed selection.

241.  GINN nonetheless employed marketing tactics that misled, pressured, encouraged, and induced prospective buyers, including Plaintiffs, to make uninformed decisions and buy Conservatory at Hammock Beach and Tesoro properties "site unseen".

242.  At the Priority Reservation Selection Event, GINN informed the buyers of which property had been purchased for them by revealing the property-purchaser pairings on flat screen televisions in a "breaking news" fashion, between 10 and 11 A.M.

243.  At the Priority Reservation Selection Event, some prospective purchasers learned that GINN did not purchase a GINN property for them.

48

244.   GINN then directed such purchasers to "Sales Tents" and provided food, entertainment, free helicopter rides, and children's activities so that such purchasers would not leave the GINN developments, and GINN directed those purchasers to GINN "Sales Tents" where certain lenders GINN had selected were stationed along with GINN sales agents.

245.   In the "Sales Tents", GINN offered buyers opportunities to purchase non-GINN owned "resale" properties.

246.   Within and about GINN's "Sales Tents" were GINN sales representatives, who were equipped with loud two-way radios to convey a sense of fevered activity and limited buying opportunities.

247.   Potential resale buyers, were subjected to claims of GINN sales representatives and GINN's selected lenders that relatively low-priced properties were selectively available.

248.   After such potential resale buyers were within GINN's Sales Tents, a radio call would be transmitted indicating the relatively low-priced property had just been sold or withdrawn, leaving only higher-priced properties available to the buyer.

249.   Buyers, including Plaintiffs, were not given a reasonable opportunity to evaluate the potential purchase opportunities and were not allowed to physically inspect the property before purchase.

250.   Buyers, including Plaintiffs, were presented with voluminous sales documents which had been prepared by GINN, including selective disclaimers, with no opportunity to review the extensive paperwork or negotiate the terms.

251.   The terms and conditions of said sales documents had been completed by GINN's agents or employees, before specific prospective buyers of said properties had been identified so that the only blanks to be filled in were the buyers' names.

252.   Said sales documents were offered to such prospective "resale" buyers on a "take-it or leave-it" basis.

253.   Through GINN's Marketing Scheme, GINN effectively determined and fixed the sales prices for properties in the GINN developments.

254.   The purpose, intent and goal of the Marketing Scheme, was to prevent buyers from engaging in fair negotiating opportunities and arms-length transactions and to distract, decoy, and otherwise deter buyers from exercising their rights to fully evaluate and reasonably assess the deals presented.

255.   Through GINN's Marketing Scheme and as a proximate result of the actual or implied representations GINN made to prospective buyers, unsuspecting out-of-state buyers, including Plaintiffs, were duped into believing that Lots purchased through GINN could be immediately resold at a substantially higher price such that everyone who purchased a property through GINN was certain to make an immediate profit, despite paying tens of thousands of dollars in real estate commissions, taxes, and closing costs.

256.   The actions described in paragraphs 138 through 255 constitute a scheme or device ("GINN's Marketing Scheme") purposefully designed to create the illusion of fierce demand and scarce supply, to facilitate Bella Collina owner/sellers who employed GINN to grossly inflate sales prices to purchasers, and to bind purchasers to contracts with little or no time to evaluate the proposed transactions.

257.   FELICIANO retained CENTURY 21 to act as a single agent broker to represent them in the purchase of the FELICIANO'S properties.

258.   Plaintiffs have been damaged and continue to sustain damages which include, but are not limited to:

a.     Property taxes on the Property from the Closing Dates until the date of judgment;

b.     Homeowners' association fees on the Properties from the Closing Dates until the date of judgment;

c.     Interest and expenses incurred on the promissory notes and mortgages which the Plaintiffs obtained in connection with the purchases of the Properties from the Closing Date until the date of judgment;

d.     Insurance of the Properties from the Closing Dates until the date of judgment;

e.     Expenses related to the closings which the Plaintiffs incurred;

f.     Loss of equity in the Properties from the Closing Dates until the date of judgment;

g.     Late fees, interest, and other consequential and incidental expenses related to any and all of the aforementioned damages;

h.     Prejudgment interest on amounts paid by the Plaintiffs for any and all of the aforementioned damages.

259.     All conditions precedent have been satisfied, occurred, or been waived.

COUNT I
RESCISSION – GINN-PINE ISLAND

260.     Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

261.     The Sales Agreements were valid and legally enforceable contracts between GINN-PINE ISLAND and the Plaintiffs, or became such by way of merger with the closing documents.

262.   Plaintiffs hereby rescind the Sales Agreements and notify GINN-PINE ISLAND of same.

263.   PLAINTIFFS hereby offer to restore the deed and title to the Properties to GINN-PINE ISLAND.

264.   Rescission is warranted due to fraud or mutual mistake.

265.   PLAINTIFFS have no adequate remedy at law, in part, because the maintenance costs associated with the properties are ongoing, continuing, and unreasonable to impose upon the Plaintiffs who did not voluntarily and knowingly accept responsibility for such obligations.

WHEREFORE, Plaintiffs demand judgment against GINN-PINE ISLAND for rescission, damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT II
## BREACH OF WARRANTY – GINN-PINE ISLAND

266.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

267.   The Sales Agreements were valid and legally enforceable contracts between GINN-PINE ISLAND and the Plaintiffs, or became such by way of merger with the closing documents.

268.   GINN-PINE ISLAND warranted "that there are no facts known to Seller materially affecting the value of the Property which are not readily observable by Buyer or which have not been disclosed to Buyer."

269.   Under the common law of Florida, the warranty described in the preceding paragraph is implied in the Sales Agreements and includes facts that materially affect the desirability of the Property.

270.   GINN-PINE ISLAND breached said express or implied warranties.

271.   Plaintiffs have been damaged and continue to sustain damages as a proximate result of GINN-PINE ISLAND's breach of warranty, and such damages include, but are not limited to, those identified in paragraph 258.

272.   The damages mentioned in the preceding paragraph were reasonably foreseeable by GINN-PINE ISLAND when it breached the express or implied warranties.

WHEREFORE, Plaintiffs demand judgment against GINN-PINE ISLAND for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT III
### FRAUDULENT INDUCEMENT – GINN-PINE ISLAND

273.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

274.   The Sales Agreements were valid and legally enforceable contracts between GINN-PINE ISLAND and the Plaintiffs, or became such by way of merger with the closing documents.

275.   GINN-PINE ISLAND made false statements to the Plaintiffs regarding material facts.

276.   When GINN-PINE ISLAND made the misrepresentations, it intended such misrepresentations to induce the Plaintiffs to act on them.

277.   Plaintiffs justifiably relied on GINN-PINE ISLAND's misrepresentations when they entered into and closed on the Sales Agreements.

278.   Plaintiffs would not have entered into the Sales Agreement or closed on same if GINN-PINE ISLAND had told the truth and provided a timely and full disclosure.

279.   Plaintiffs have been damaged and continue to sustain damages as a proximate result of the fraud perpetrated by GINN-PINE ISLAND, and such damages include, but are not limited to, those specified in paragraph 258.

280.   The damages mentioned in the preceding paragraph were reasonably foreseeable by GINN-PINE ISLAND when it made the misrepresentations.

WHEREFORE, Plaintiffs demand judgment against GINN-PINE ISLAND for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

COUNT IV
PROFESSIONAL NEGLIGENCE – GINN

281.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

282.   Pursuant to Sections 475.01(1)(a) and (1)(j), Florida Statutes, a real estate "broker" and a "sales associate" each "renders a professional service and is a professional".

283.   At all times material hereto, GINN was a professional within the meaning of Sections 475.01(1)(a) and (1)(j), Florida Statutes.

284.   GINN owed the Plaintiffs a common law duty to use reasonable skill, care, and diligence in the performance of their profession, in accord with the standard of care used by similar professionals in the community under similar circumstances.

285.   Similar real estate professionals in the community under similar circumstances would have adhered and complied with Florida Statutes and regulations which govern the conduct of professional realtors and real estate corporations.

286.   GINN breached its duty to the Plaintiffs by, among other things:

   a.   Violating numerous Florida Statutes;

54

b.      Representing GINN-PINE ISLAND to the detriment of the Plaintiffs with regard to the negotiation of and closing on the Sales Agreement;

c.      Failing to timely provide the Plaintiffs with a with a written notice of brokerage representation as required by Section 475.278, Florida Statutes;

d.      Misrepresenting to the Plaintiffs that GINN was acting as a Transaction Broker with regard to the sale of the Property from GINN-PINE ISLAND to the Plaintiffs when GINN in fact represented GINN-PINE ISLAND as a Single Agent;

e.      Advising the Plaintiffs that they would have a club membership when they closed on the Property, and such membership was transferable to subsequent purchasers, without also advising the Plaintiffs that a Twelve Thousand Five Hundred Dollar ($12,500) "Membership Deposit" was required to be paid before such membership was realized; and

f.      Failing to provide full disclosure of numerous conflicts of interest presented by interests and affiliations that the various GINN companies and partnerships have with each other.

287.    Plaintiffs have been damaged and continue to sustain damages as a proximate result of GINN's breaches of professional duty, and such damages include, but are not limited to, those specified in paragraph 258.

288.    The damages mentioned in the preceding paragraph were reasonably foreseeable by GINN when they breached their professional duties.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT V
### BREACH OF FIDUCIARY OR STATUTORY DUTY – GINN

289.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

290.   Pursuant to Sections 475.01(1) and 475.278, Florida Statutes, and the common law of Florida, GINN owed the Plaintiffs full fiduciary or statutory duties.

291.   By virtue of their relationship with the Plaintiffs, GINN had a fiduciary relationship with the Plaintiffs.

292.   GINN breached their duty to the Plaintiffs by, among other things:

    a.   Violating numerous Florida Statutes, including but not limited to, those identified in paragraph 258.

    b.   Representing GINN-PINE ISLAND to the detriment of the Plaintiffs with regard to the negotiation of and closing on the Sales Agreement;

    c.   Failing to timely provide the Plaintiffs with a with a written notice of brokerage representation as required by Section 475.278, Florida Statutes;

    d.   Misrepresenting to the Plaintiffs that GINN was acting as a Transaction Broker with regard to the sale of the Property from GINN-PINE ISLAND to the Plaintiffs when GINN in fact represented GINN-PINE ISLAND as a Single Agent;

    e.   Advising the Plaintiffs that they would have a club membership when they closed on the Property, and such membership was transferable to subsequent purchasers, without also advising the Plaintiffs that a Twelve Thousand Five Hundred Dollar ($12,500) "Membership Deposit" was required to be paid before such membership was realized;

f.    Perpetrating and inducing a fraud by demanding that the Plaintiffs sign the Disclosure Document when GINN had possession and control over the documents containing the material disclosures and refused to deliver such documents to the Plaintiffs before an offer was accepted;

g.    Aiding, allowing, abetting, and facilitating non-licensees to perform professional real estate services while not they were not under the direction, supervision, and control of a licensee; and

h.    Failing to provide full disclosure of numerous conflicts of interest presented by interests and affiliations that the various GINN companies and partnerships have with each other.

293.   Plaintiffs have been damaged and continue to sustain damages as a proximate result of GINN's breaches of fiduciary or statutory duty, and such damages include, but are not limited to, those specified in paragraph 258.

294.   The damages mentioned in the preceding paragraph were reasonably foreseeable by GINN when they breached their fiduciary or statutory duties.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT VI
## BREACH OF CONTRACT – GINN

295.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

296.   This is an action against GINN for breach of contract, or alternatively for promissory estoppel.

57

297.   Plaintiffs entered into a contract with GINN to provide real estate services and represent the Plaintiffs as a single agent in the purchase and closing of the Property. Alternatively, GINN made promises to the Plaintiffs that are legally enforceable promises under the principles of promissory estoppel.

298.   In consideration for the Plaintiffs' promise to allow GINN to receive a commission from the sale of the Property, GINN promised to represent the Plaintiffs as a single agent in connection with the purchase and closing of the sale. GINN accepted and agreed to owing the Plaintiffs the duties enumerated in paragraph 258, above. Alternatively, the promises made by GINN to the Plaintiffs are legally enforceable promises under the principles of promissory estoppel.

299.   Plaintiffs justifiably relied on the promises GINN made to them.

300.   GINN materially breached its promises or contractual duties.

301.   Plaintiffs suffered damages as a direct and proximate result of GINN's breaches of contract or its failing to perform its promises, and such harm was reasonably foreseeable by GINN. Such damages include, but are not limited to, those specified in paragraph 258.

302.   If the Plaintiffs did not have a valid contract with GINN, then the Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, special damages identified in paragraph 258, interest. costs. attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT VII
## CONSTRUCTIVE FRAUD – GINN

303.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

304.    Pursuant to Sections 475.01(1) and 475.278, Florida Statutes, and the common law of Florida, GINN had a special, confidential, and/or fiduciary relationship with the Plaintiffs.

305.    GINN abused their special, confidential, and/or fiduciary relationship with the Plaintiffs by, among other things:

      a.    Violating numerous Florida Statutes, including but not limited to, those identified in paragraph 258.

      b.    Representing GINN-PINE ISLAND to the detriment of the Plaintiffs with regard to the negotiation of and closing on the Sales Agreement;

      c.    Failing to timely provide the Plaintiffs with a with a written notice of brokerage representation as required by Section 475.278, Florida Statutes;

      d.    Misrepresenting to the Plaintiffs that GINN was acting as a Transaction Broker with regard to the sale of the Property from GINN-PINE ISLAND to the Plaintiffs when GINN in fact represented GINN-PINE ISLAND as a Single Agent;

      e.    Advising the Plaintiffs that they would have a club membership when they closed on the Property, and such membership was transferable to subsequent purchasers, without also advising the Plaintiffs that a Twelve Thousand Five Hundred Dollar ($12,500) "Membership Deposit" was required to be paid before such membership was realized;

      f.    Perpetrating and inducing a fraud by demanding that the Plaintiffs sign the Disclosure Document when GINN had possession and control over the documents containing the material disclosures and refused to deliver such documents to the Plaintiffs before an offer was accepted;

g.    Aiding, allowing, abetting, and facilitating non-licensees to perform professional real estate services while not they were not under the direction, supervision, and control of a licensee; and

h.    Failing to provide full disclosure of numerous conflicts of interest presented by interests and affiliations that the various GINN companies and partnerships have with each other.

306.    Plaintiffs have been damaged and continue to sustain damages as a proximate result of GINN'S constructive fraud, and such damages include, but are not limited to, those specified in paragraph 258.

307.    The damages mentioned in the preceding paragraph were reasonably foreseeable by GINN when they abused their special, confidential, and/or fiduciary relationship with the Plaintiffs.

308.    Plaintiffs are entitled to attorneys' fees for the maintenance of this action pursuant to the principals of common law indemnity.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT VIII
### UNJUST ENRICHMENT – GINN

309.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

310.    GINN knowingly and voluntarily received and retained a benefit from the Plaintiffs in the form of a commission from the sale of the Property from GINN-PINE ISLAND to the Plaintiffs.

311.   The circumstances render GINN's retention of the benefit inequitable unless GINN pays to the Plaintiffs the value of the benefit.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

COUNT IX
FRAUDULENT INDUCEMENT – GINN

312.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

313.   The Sales Agreement was a valid and legally enforceable contract between GINN-PINE ISLAND and the Plaintiffs, or it became one by way of merger with the closing documents.

314.   GINN made false statements to the Plaintiffs regarding material facts.

315.   The Plaintiffs justifiably relied on GINN's misrepresentations when they entered into and closed on the Sales Agreement.

316.   Plaintiffs would not have entered into the Sales Agreement or closed on same if GINN had told the truth and provided a timely and full disclosure.

317.   Plaintiffs have been damaged and continue to sustain damages as a proximate result of the fraud perpetrated by GINN, and such damages include, but are not limited to, those specified in paragraph 258.

318.   The damages mentioned in the preceding paragraph were reasonably foreseeable by GINN when he made the misrepresentations.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

COUNT X
INFORMATION NEGLIGENTLY PROVIDED FOR THE GUIDANCE OF OTHERS – GINN

319.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

320.   GINN supplied false information to the Plaintiffs in the course of the GINN's business or the course of convincing the Plaintiffs to enter into and close on a real estate transaction in which GINN had a financial interest.

321.   GINN was negligent in obtaining or communicating the false information, including, but not limited to the information regarding the circumstances regarding the construction of a home on the Property and the profitability of renting such a home out.

322.   Plaintiffs were persons for whose benefit and guidance GINN intended to supply the false information for use in the Plaintiffs' business transaction.

323.   GINN intended the false information to influence the Plaintiffs in that business transaction.

324.   Plaintiffs justifiably relied on the false information.

325.   Plaintiffs' reliance upon the false information caused them economic damage, including, but not limited to, those damages specified in paragraph 258.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT XI
### VIOLATION OF THE FAIR HOUSING ACT – GINN

326.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

327.    GINN violated one or more sections of the Fair Housing Act and its implementing regulations, by discriminating against the Plaintiffs on the basis of their national origin.

328.    Plaintiffs are persons whom the Fair Housing Act and its implementing regulations were designed to protect.

329.    PLAINTIFFS has suffered damages as a direct and proximate result of GINN's violating the Fair Housing Act and its implementing regulations.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT XII
### VIOLATION OF INTERSTATE LAND SALES ACT FAILURE TO PROVIDE PROPERTY REPORT – GINN

330.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

331.    GINN is a "developer" as defined under ILSA, or controls one or more entities that are "developers" as defined under ILSA, including, but not limited to THE GINN COMPANY, GINN COMPANY, LLC, GINN-LA WILDERNESS LTD., LLLP, GINN-LA HAMMOCK BEACH LTD., LLLP, GINN-LA ORLANDO LTD., LLLP, and GINN-LA PINE ISLAND LTD., LLLP.

332.    GINN directly or indirectly used instruments of communication such as newspapers, emails, telephone calls and other methods of communication in interstate commerce and the mails with respect to the sale of property to Plaintiffs.

333.    The rules promulgated by the Housing and Urban Development require that certain information be provided in a Federal Property Report and that the report be filed with the department of Housing and Urban Development Land Sales Division. 15 U.S.C. 1701-1719.

334.    Pursuant to Section 1707 of ILSA, as required by Section 1703(a)(1)(B), GINN, when engaged in interstate commerce, are required to provide all prospective purchasers with a detailed property report containing specific information about the property contained in a development prior to the execution of a purchase agreement.

335.    Plaintiffs herein have never received in advance from GINN, any other counter- or third-party defendant, or from any other person, with respect to the property they purchased, a property report meeting the requirements of Section 1707 of ILSA, as required by Section 1703(a)(1)(B).

336.    GINN in violation of 15 U.S.C. 1703 (a)(l)(c) used property reports that omitted material facts required to be stated in the property report and therefore failed to meet the requirements of the Housing and Urban Development for some of the following reasons:

    a.    The property reports do not list the addresses of any lien holders.

    b.    The legal description of the development is not listed in the report.

    c.    The map of the property is not attached to the report.

    d.    The range of prices for the units is not listed in the report.

337.    Federal law requires that this information be listed in the property report irrespective of whether or not this information is provided in other documents.

338.   GINN was aware of the law as it registered other developments with the Housing and Urban Development.

339.   GINN failed to comply with ILSA by not delivering a property report as is required by the Department of Housing and Urban Development.

340.   ILSA is a strict liability statute and the mere violation of not providing the property report puts GINN in violation of ILSA and requires GINN to repurchase all properties from Plaintiffs.

341.   GINN has refused to re-purchase the Lots as is required under 15 U.S.C. 1703.

342.   Plaintiffs have been proximately damaged by GINN'S ILSA violations, including, but not limited to, those damages specified in paragraph 258, all money paid by Plaintiffs to GINN under the purchase agreement, and costs of travel to and from the developments.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, special damages identified in paragraph 258 and 342, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

COUNT XIII
VIOLATION OF THE INTERSTATE LAND SALES ACT
FRAUD AND DECEIT UPON PURCHASERS – GINN

343.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

344.   GINN engaged in a plan or course of conduct to sell Plaintiffs Lots in an unfair, misleading and fraudulent manner in violation of Section 1703 (2)(A)(B) and (C) of ILSA.

345.   GINN (i) employed a scheme or device to defraud Plaintiffs; (ii) obtained money by means of untrue statements of material facts, and omitted to state material facts that were necessary to make statements that were made by GINN to Plaintiffs (in light of circumstances in

65

which they were made and within the context of the overall offer and sale) not misleading, with respect to any information pertinent to the property; and (iii) engaged in a practice and course of business which operated as fraud and deceit upon Plaintiffs.

346. GINN engaged in the foregoing fraud and deceit by failing to properly inform Plaintiffs of material facts relevant to make informed purchases by using marketing devices such as newspapers and direct mailings that gave false information to Plaintiffs. In addition to the fraud and deceit stated in the facts above, GINN engaged in other fraud and deceit by, among other things:

a. Utilizing knowingly false claims of limited Lot availability and imminent price increases while in fact the prices were inflated due to false and deceptive appraisals manufactured by GINN;

b. Failing to disclose the actual costs of owing a Lot;

c. Representing that significant profits could be made in a relatively short period of time;

d. Representing that numerous investors already made substantial profits from sales of lots and that more investors were readily available to purchase the Lots from Plaintiffs at a substantial profit;

e. Engaging in a "Ponzi Scheme" to permit unsuspecting Plaintiffs to believe that the properties were valued as represented while in fact such values were artificially inflated by GINN;

f. GINN employed a scheme or device that created false indications of demand for the properties by requesting that every person who desired a property list as many alternative properties as possible in order of

preference in the event that they could not get their first choice of property. Instead of disclosing the actual number of "purchasers", GINN disclosed the number of "selections" made by prospective purchasers and had the purchasers believing that there were multiple buyers for each lot when in fact GINN knew that individuals were only awarded 1 lot and such action was misleading and acted as a deceit upon purchasers who had an intent as investors. In addition, this action induced other prospective purchasers to purchase properties that Ginn Real Estate Company was listing with the expectation of quick profits; and

g.    GINN always stated that the properties initially owned by GINN in each development were sold at the property launches and represented that they had no excess inventory of properties.

347.   Plaintiffs reasonably relied on the foregoing fraudulent and deceitful representations of GINN and such representations, if true, were material to the Plaintiffs' decision to purchase the property in question.

348.   In promoting one of its more expensive communities known as Bella Collina, GINN created a scheme to "run up" - the prices of its lots and sell them to prospective purchasers. Prior to the property launch, GINN brought in a fake buyer who stated that he wanted to buy a lot from a purchaser in excess of $2,000,000 dollars. The fake buyer executed a purchase agreement. Had the sale been consummated, the owner would have made over $1,000,000 in profit. Although GINN stated to the owner that the purchaser had given a deposit, there in fact was never a deposit. Word of this potential sale spread quickly and then GINN had its property launch with investors desperately trying to get lots at the launch with the hopes of

making a profit upon selling the property. After the launch, and after all the people awarded properties at the launch closed, the owner was told that the purchaser backed out and in fact there was no deposit held by GINN or anyone else.

349.    Also, GINN represented that certain purchasers would have properties containing a golf course view. After closing, GINN moved the golf course in a manner to give the owner a completely different view than was promised thereby diminishing the value of the lot.

350.    GINN should have known that its actions would induce other people to want to purchase properties.

351.    The acts complained of constitute a violation of Section 1703(a)(2)(a)(b)(c) of ILSA, entitling Plaintiffs, pursuant to Section 1703 and 1709 of ILSA, to revoke their contract or in the alternative to seek damages.

352.    Plaintiffs have been proximately damaged by GINN'S ILSA violations, including, but not limited to, those damages specified in paragraph 258, all money paid by Plaintiffs to GINN under the purchase agreement, and costs of travel to and from the developments.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, special damages identified in paragraph 258 and 352, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT XIV
### VIOLATION OF SECURITIES AND EXCHANGE RULES REGISTRATION. REPORTING AND DISCLOSURE REQUIREMENT – GINN

353.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

354.    It is unlawful to sell any securities through use of means of interstate commerce without registering the security with the Securities and Exchange Commission, without

complying with reporting requirements and by failing to disclose certain information. 15 U.S.C. 78(e).

355.    The term "security" as defined by the Securities and Exchange act of 1934 includes investment contracts.

356.    The Securities and Exchange Commission defines Investment Contracts as: contracts, transactions, or schemes whereby a person invests his money in and is led to expect profits solely from the efforts of the promoter or a third party.

357.    Several Ginn agents stated to Plaintiffs that the Lots, once purchased, could be sold at a significant profits.

358.    In reliance on those representations, Plaintiffs purchased lots.

359.    Ginn and its agents knew or had reason to know that the only reason these Lots that were being purchased by Plaintiffs, were for investment purposes.

360.    Ginn and its agent knew or had reason to know that the Plaintiffs were relying on Ginn and its agents to resell the properties.

361.    Upon information and belief, GINN: (i) did not register the investment contracts with the Securities and Exchange Commission: (ii) did not comply with the reporting requirements of the Securities and Exchange Commission and; (iii) failed to disclose certain information to both the investor and the Securities and Exchange Commission in derogation of 15 U.S.C. 78.

362.    As a result of GINN'S conduct, Plaintiffs have been proximately damaged and such damages include, but are not limited to, those damages specified in paragraph 258, all money paid by Plaintiffs to GINN under the purchase agreement, and costs of travel to and from the developments.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, special damages identified in paragraph 258 and 362, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

COUNT XV

FALSE REPRESENTATION UNDER SECURITIES EXCHANGE ACT OF 1934 – GINN

363.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

364.    GINN used an instrumentality of interstate commerce in connection with the securities transaction involved in this case by use of United States mail, via email, and telephone.

365.    GINN made misrepresentations of material facts and failed and omitted to state material facts in connection with the securities transactions involved in this case. GINN made the following false or misleading statements in derogation of 15 U.S.C. 78:

    a.    GINN, its sales representatives, its agents, and its affiliates stated that if Plaintiffs purchased Lots in the GINN developments, Plaintiffs could immediately resell the units and realize substantial profits.

    b.    In an attempt to induce Plaintiffs to purchase properties, GINN real estate agents and brokers would give Plaintiffs tours of the undeveloped properties and would make representations regarding how much certain purchasers paid for certain Lots and the amount of gain those individuals enjoyed and the short period of time in which the gain was realized without informing Plaintiffs that the property values were artificially inflated due to manufactured appraisals.

    c.    GINN misrepresented the rental value and income of the Property.

d.   GINN misrepresented when the Property could be built upon.

e.   GINN created and perpetuated a "Ponzi Scheme" in which returns to investors were not financed through the success of the underlying business venture, but were taken from principal sums of newly attracted purchasers such as Plaintiffs. Plaintiffs were promised large returns for their investments. Initial purchasers were actually paid the promised returns, which attracted additional purchasers such as Plaintiffs. GINN set up a regularly operating business, but GINN's purpose was to lure Plaintiffs into the scheme knowing that the units being sold were never worth the purchase price paid by Plaintiffs. Third-party Defendant created the multiple-tiered marketing scheme by, among other things, representing to Plaintiffs and similarly situated persons that the profits being realized by investors were legitimate and Third-party Defendant actively encouraged individuals to purchase properties in GINN Developments.

f.   GINN initially brought in several of its associates to purchase property for an inflated and manufactured value. These manufactured purchase prices created a false and deceptive basis in the price for the properties. This false and deceptive basis in the price of the property permitted licensed appraisers to create inaccurate appraisal values for the properties. These inaccurate appraisals induced lenders to grant loans secured by the properties while in fact the properties were worth significantly less than their appraisals and these false and manufactured values induced Plaintiffs to purchase the properties.

g.    GINN'S failure to disclose that its principal Edward R. "Bobby" Ginn was a director of Suntrust Bank is an omission material fact since many purchasers financed their purchase through Suntrust Bank. Had Plaintiffs been aware of this conflict, Plaintiffs would not have purchased any properties and would have been skeptical of the entire Ginn organization.

366.    GINN acted knowingly or with reckless disregard. Pursuant to 15 U.S.C. 78u-4(b)(1), Plaintiffs allege that the facts and circumstances showing that the Third-party Defendant acted with the required state of mind, and at the time that the defendant made the false or misleading representations described above, they knew that they were false.

367.    Given GINN's involvement in the Multiple-Tier Marketing Scheme, GINN knew or should have known that these transactions were completely inconsistent with a legitimate business practice and were wholly consistent with a Ponzi Scheme and fraud scheme since there was no possibility of any value being added to the property by GINN since the property values were already ridiculously over inflated.

368.    The representations had no other purpose than to induce Plaintiffs and persons similar to Plaintiffs to purchase property· in developments owned by GINN. The representations were contained in a prospectus and in exhibits attached to the prospectus which clearly reveal to be sales brochures knowingly manufactured by GINN. Thus, the false or misleading representations were made to the Plaintiffs by GINN with the intention that the Plaintiffs should ·rely on these representations with a clear intent to deceive, manipulate and defraud Plaintiffs.

369.    As a result of the representations by GINN, Plaintiffs had reason to justifiably rely and did justifiably rely on the representations as some Plaintiffs visited the developments, spoke to GINN agents and investigated the claims of profitability, interviewed prior investors who

made claims of profits, and reviewed comparable sale reports that were supplied by GINN. In reliance on GINN'S representations, which representations were false when made, Plaintiffs, entered into certain written investment contracts.

370. As a proximate cause of GINN'S misrepresentations, acts and omissions of the matters alleged above, the Plaintiffs have been damaged and but for the misrepresentations, acts, and omissions of GINN such damage would not have occurred.

371. As a result of GINN'S conduct, Plaintiffs have been proximately damaged and such damages include, but are not limited to, those damages specified in paragraph 258, all money paid by Plaintiffs to GINN under the purchase agreement, and costs of travel to and from the developments.

WHEREFORE, a judgment against GINN determining that the sale of the investment contract to Plaintiffs by GINN was procured by a material misrepresentation, contrary to the provision of the Security Exchange Act of 1934, Chapter 4, Stat. 881, 15 D.S.C. 78j and Rule 10b-5, promulgated pursuant to the Act 17 C.F.R. 240.10B-5 and therefore, this court should award Plaintiffs a judgment against GINN in the amount of Plaintiffs' losses, special damages identified in paragraph 258 and 371, together with interest and a judgment for actual attorney's fees, costs of suit, and any and all other relief that appears to the court equitable under the circumstances.

COUNT XVI
"PONZI SCHEME"AND
VIOLATION OF SECTION 10(b) OF THE SECURITIES AND EXCHANGE ACT – GINN

372. Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

373. . All GINN Affiliated Entities were set up and run for the exclusive purpose of raising money from unsuspecting purchasers, like Plaintiffs, for the benefit of GINN and GINN Affiliated Entities.

374. GINN created a complicated maze of companies to be used in marketing. soliciting and promoting properties to potential purchasers in order to avoid the scrutiny of U.S. regulators including the Securities and Exchange Commission, while at the same time perpetuating a "Ponzi Scheme" in which returns to investors were not financed through the success of the underlying business venture, but were taken from principal sums of newly attracted purchasers such as Plaintiffs. Plaintiffs were promised large returns for their investments. Initial purchasers were actually paid the promised returns, which attracted additional purchasers such as Plaintiffs. GINN set up a regularly operating business, but GINN's purpose was to lure Plaintiffs into the scheme knowing that the units being sold were never worth the purchase price paid by Plaintiffs.

375. GINN understood that the second- and third-tier purchasers, who were the initial purchasers that were actually paid the promised returns, were used by GINN for the exclusive purpose of marketing and promoting future fraudulent sales to Plaintiffs and similarly situated individuals. Nevertheless, from the beginning, GINN through the developments they controlled made substantial transfers and sales of properties, which resulted in new investor funds being used by GINN to pay returns to old investors.

376. GINN created the multiple-tiered marketing scheme by, among other things. representing to Plaintiffs and similarly situated persons that the profits being realized by investors was legitimate and GINN actively encouraged individuals to purchase properties in GINN Developments.

377.   Given its intimate knowledge of the multiple-tier marketing scheme, GINN and its affiliates knew that more property was being purchased, sold and resold, then should have been in a development that GINN claims was developed for "end-users' and not "investors".

378.   Despite actual or constructive knowledge of the fraudulent nature of the marketing scheme, GINN and its affiliates, through the GINN Real Estate Company, continued in marketing the scheme and selling Lots to purchasers which resulted in new purchasers being used by GINN and its affiliates to pay returns to old investors.

379.   In promoting the scheme, GINN brought in several of its associates to purchase property for an inflated and manufactured value. These manufactured purchase prices created a false and deceptive basis in the price for the properties. This false and deceptive basis in the price of the property permitted licensed appraisers to create inaccurate appraisal values for the properties. These inaccurate appraisals induced lenders to grant loans secured by the properties while in fact the properties were worth significantly much less than their appraisals. When lenders realized that the properties had an inflated value, the lenders stopped issuing loans on these properties.

380.   In furtherance of the "Ponzi Scheme" purchasers were referred by GINN to Suntrust Bank to obtain financing in order to purchase properties. Upon information and belief, at that time, Edward R. "Bobby" GINN, was on the board of directors of Suntrust Bank.

381.   Upon information and belief, Mr. Ginn, using his influence as a director of Suntrust Bank, made it easier for the initial purchasers to obtain financing knowing that the appraisals were inaccurate and manufactured.

382.   The success of the scheme depended on GINN'S ability to find a complicit bank that would be willing to loan money to prospective purchasers of properties that were knowingly

overvalued and that were worth much less than there appraisals and that would be willing to facilitate transactions.

383.  Suntrust Bank knew or should have known that GINN was engaged in a "Ponzi Scheme" especially since the properties were substantially increasing in value in a relatively short period of time and then being resold and financed through Sun trust Bank for hundreds of thousands of dollars more than the properties were initially purchased for less than a few months before.

384.  Despite Suntrust's knowledge, it continued to provide loans for properties that could not sustain their value as if it did not have the knowledge or suspicions.

385.  Suntrust actions perpetuated the "Ponzi Scheme" and strengthened the "Ponzi Scheme" since Plaintiffs relied on what should have been Suntrust's normal diligent inquiry into the value of collateral before lending.

386.  Once GINN sold enough units and vacant lots and other lenders began financing properties based upon the appraisals and the past loan history with Suntrust Bank, Suntrust Bank, with full knowledge of the "Ponzi Scheme" ceased to finance any future purchasers knowing that the prices were inflated and knowing that the GINN real estate market would soon collapse.

387.  GINN knew that its actions would induce other people to purchase properties thereby generating billions of dollars in investment capital and lining the pockets of GINN and GINN'S affiliates in classic Ponzi fashion.

388.  GINN regularly sent agents to other states to solicit purchasers for their developments. GINN officials began to market the Multiple-Tier Marketing Scheme to these purchasers and potential purchasers making the representations of quick profits.

389.    Given GINN'S involvement in the Multiple-Tier Marketing Scheme, GINN knew or should have known that these transactions were completely inconsistent with a legitimate business practice and were wholly consistent with a Ponzi Scheme and fraud scheme since there was no possibility of any value being added to the property by GINN since the property values were already ridiculously over inflated.

390.    GINN continued with the acts of selling properties to the second tier and third tier purchasers to satisfy GINN'S Affiliated Entities. GINN'S actions perpetuated the Ponzi scheme by ensuring that old investors were paid timely and strengthened the Ponzi scheme by enhancing the track record of the company by having a high turnover with significant profits.

391.    By reason of such activities, GINN and its affiliates violated Section 10(b) of the Exchange Act 15 U.S.C. 78j(b) and Rule 10b(5) [17 c.F.R. 240.10b-5], promulgated under the Act ("Rule 10b-5 Violations").

392.    As a direct and proximate result of GINN and its affiliates' Rule 10b-5 Violations, as described above, purchasers were unable to sell or recoup their money. In addition, because the value of the properties decreased, the purchasers lost significant profits it could otherwise have made.

393.    As a direct and proximate result of GINN and its affiliates' fraud and misrepresentation, Plaintiffs were unable to sell or recoup their money. In addition, because the value of the properties decreased, the Plaintiffs lost significant profits which they could otherwise have made.

394.    Plaintiffs have been proximately damaged by GINN'S conduct, including, but not limited to, those damages specified in paragraph 258, all money paid by Plaintiffs to GINN under the purchase agreement, and costs of travel to and from the developments.

WHEREFORE, a judgment against GINN determining that the sale of the investment contract to Plaintiffs by GINN was procured by a material misrepresentation, contrary to the provision of the Security Exchange Act of 1934, Chapter 4, Stat. 881, 15 D.S.C. 78j and Rule 10b-5, promulgated pursuant to the Act 17 C.F.R. 240.10B-5 and therefore, this court should award Plaintiffs a judgment against GINN in the amount of Plaintiffs' losses, special damages identified in paragraph 258 and 394, together with interest and a judgment for actual attorney's fees, costs of suit, and any and all other relief that appears to the court equitable under the circumstances.

COUNT XVII
VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT – GINN

395.     Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

396.     GINN violated the Real Estate Settlement Procedures Act (RESPA) by unlawfully receiving illegitimate referral fees, kickbacks, and things of value from its "preferred lenders".

397.     Plaintiffs have been proximately damaged by GINN'S RESPA violations, including, but not limited to, those damages specified in paragraph 258, all money paid by Plaintiffs to GINN under the purchase agreement, and costs of travel to and from the developments.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, special damages identified in paragraph 258 and 397, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

<u>COUNT XVIII</u>
VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT – GINN

398.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

399.    GINN is a "lender" within the meaning of the Equal Credit Opportunity Act (ECOA) and Regulation B, because, among other reasons, GINN regularly arranges for extensions of credit for real estate purchasers.

400.    Plaintiffs are "applicants" within the meaning of the ECOA and Regulation B.

401.    GINN violated one or more provisions of the ECOA and Regulation B, by among other things discriminating on the basis of national origin.

402.    Plaintiffs have been damaged as a proximate result of GINN'S violations of the ECOA and Regulation B.

403.    Plaintiffs have been proximately damaged by GINN'S ECOA and Regulation B violations, including, but not limited to, those damages specified in paragraph 258, all money paid by Plaintiffs to GINN under the purchase agreement, and costs of travel to and from the developments.

WHEREFORE, Plaintiffs request relief, as follows: that they be granted judgment against GINN in the total amount of all damages suffered by them as a result of GINN's wrongful acts; that they be awarded special damages identified in paragraph 258 and 403; that they be granted judgment against GINN for all costs of this action, including reasonable attorney's fees; and that this Court grant them any other relief that it considers just and appropriate under the circumstances.

<u>COUNT XVIV</u>
VIOLATION OF RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS
(RICO) – GINN

404.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

405.    This Count arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961 et seq., and the Florida RICO (Racketeer Influenced and Corrupt Organizations) Act, Chapter 895, Florida Statutes.

406.    GINN is an enterprise, within the meaning of 18 U.S.C. 1961 and § 895.02, Florida Statutes, which is engaged in, or the activities of which affect, interstate or foreign commerce.

407.    The fraudulent misrepresentations detailed above were made by GINN to Plaintiffs.

408.    The fraudulent misrepresentations set forth above represented a scheme and artifice to defraud Plaintiffs, which was facilitated by use of the United States Mail, caused by GINN, and resulting in mail fraud within the meaning of 18 U.S.C. 1341.

409.    The fraudulent misrepresentations set forth above represented a scheme and artifice to defraud Plaintiffs, which was facilitated by use of interstate wire communications including the internet, electronic mails, interstate facsimiles, and interstate telephone calls, caused by GINN, and resulting in wire fraud within the meaning of 18 U.S.C. 1343.

410.    The fraudulent misrepresentations set forth above represented a scheme and artifice to defraud Plaintiffs in violation of Securities Laws and resulting in fraud within the meaning of 18 U.S.C. 1961.

411.   GINN engaged in an agreement with each of the other Defendants, with Suntrust Bank, and between and among each of the various GINN affiliates, associations, and related companies to achieve an unlawful objective.  Said agreements constitute a conspiracy within the meaning of 18 U.S.C. 371.

412.   GINN knowing and voluntarily participated in the conspiracy and committed several overt acts in furtherance of the conspiracy.

413.   The acts of GINN's co-conspirators in furtherance of the conspiracy are attributable to GINN.

414.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. 1961(l) and Section 895.02(1), Florida Statutes.

415.   Wire fraud constitutes racketeering activity as that term is defined in 18 U.S.C. 1961(l) and Section 895.02(1), Florida Statutes.

416.   Security fraud constitutes racketeering activity as that term is defined in 18 U.S.C. 1961(l), 18 U.S.C. 1962, and Section 895.02(1), Florida Statutes.

417.   GINN's multiple fraudulent misrepresentations as detailed above constitute a pattern of racketeering activity within the meaning of 18 U.S.C. 1961(5) and Section 895.02(4).

418.   GINN and GINN's agents, associates, and representatives, have and have conspired to receive income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which they have participated as a principal within the meaning of section 2, title 18, United States Code, and to use or invest, directly or indirectly, such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, GINN's enterprise, including but not limited to GINN's affiliates

and associations in violation of 18 U.S.C. 1962(a), (d) and Sections 895.03(1),(4), Florida Statutes.

419.   GINN and GINN's agents, associates, and representatives, have conspired to and have acquired or maintained, directly or indirectly, an interest in or control of an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce through a pattern of racketeering activity in violation of 18 U.S.C. 1962(b), (d) and Sections 895.03(2),(4), Florida Statutes.

420.   GINN and GINN's agents, associates, and representatives, have conducted, and have conspired to conduct, the affairs of GINN through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c), (d) and Sections 895.03(3),(4), Florida Statutes.

421.   As a direct and proximate result of these violations of 18 U.S.C. 1962 and Section 895.03, Florida Statutes, Plaintiffs have suffered actual damages as a result of injury to its property.

422.   GINN is liable to Plaintiff for treble damages, together with all costs of this action plus reasonable attorney's fees, all as provided under 18 U.S.C. 1964 and Section 895.05, Florida Statutes.

423.   Plaintiffs have been proximately damaged by GINN'S RICO violations, including, but not limited to, those damages specified in paragraph 258, all money paid by Plaintiffs to GINN under the purchase agreement, and costs of travel to and from the developments.

WHEREFORE, Plaintiffs request relief, as follows: that they be granted judgment against GINN in the total amount of all damages suffered by them as a result of GINN's wrongful acts; that they be awarded special damages identified in paragraph 258 and 423; that they be granted

judgment against GINN for treble damages suffered by reason of injury to its property as a result of GINN's violations of 18 U.S.C. 1962 and Chapter 895, Florida Statutes; that they be granted judgment against GINN for all costs of this action, including reasonable attorney's fees; and that this Court grant them any other relief that it considers just and appropriate under the circumstances.

COUNT XX
FRAUDULENT MISREPRESENTATION – GINN

424.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

425.    GINN fraudulently misrepresented material facts to the Plaintiffs.

426.    Plaintiffs have been damaged as a proximate result of GINN'S fraudulent misrepresentations.

WHEREFORE, Plaintiffs demand judgment against Defendant, GINN, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

COUNT XXI
INNOCENT MISREPRESENTATION, GINN

427.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

428.    GINN innocently misrepresented material facts to the Plaintiffs.

429.    Plaintiffs have been damaged as a proximate result of GINN'S innocent misrepresentations.

WHEREFORE. Plaintiffs demand judgment against Defendant, GINN REAL E4STATE, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

COUNT XXII
CIVIL CONSPIRACY – GINN

430.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

431.   GINN conspired with PREFERRED LENDERS and various appraisers to make fraudulent misrepresentations, fraudulently conceal material facts and information from Plaintiffs, violate the Equal Credit Opportunity Act, violate ILSA, violate federal securities law, violate RESPA, violate the standards and laws applicable to professional realtors and appraisers, and to do so by unlawful means.

432.   GINN communicated with PREFERRED LENDERS and various appraisers, and Plaintiffs and made misrepresentations to Plaintiffs in furtherance of the conspiracy.

433.   By virtue of their association, PREFERRED LENDERS, GINN, and various appraisers had a peculiar power of coercion that none of them would otherwise possess.

434.   PREFERRED LENDERS, GINN, and various appraisers acted in bad faith and with corrupt and malicious motive in carrying out their conspiracy.

435.   PREFERRED LENDERS, GINN, and various appraisers exercised coercion through numbers or economic influence.

436.   Plaintiffs have suffered damages as a result of the conspiracy.

WHEREFORE, Plaintiffs pray this Honorable Court enter a judgment against Defendant. FIFTH THIRD BANK, for damages, special damages identified in paragraph 258, costs, and attorney's fees together with such further relief as this Court deems appropriate.

## COUNT XXIII
## CONSTRUCTIVE FRAUD – PREFERRED LENDERS

437.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

438.    PREFERRED LENDERS had a confidential or fiduciary relationship with the Plaintiffs.

439.    PREFERRED LENDERS abused and took unconscionable advantage of its relationship with the Plaintiffs.

440.    Plaintiffs have been damaged as a proximate result of PREFERRED LENDERS'S conduct.

WHEREFORE, Plaintiffs demand judgment against Defendant, PREFERRED LENDERS, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT XXIV
## VIOLATION OF CHAPTER 494, FLORIDA STATUTES – PREFERRED LENDERS

441.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

442.    PREFERRED LENDERS violated one or more provisions of chapter 494, Florida Statutes, including, but not limited to Section 494.0025.

443.    PREFERRED LENDERS directly or indirectly participated in a scheme or device to defraud the Plaintiffs.

444.    Plaintiffs have been damaged as a proximate result of PREFERRED LENDERS'S violations of Chapter 494, Florida Statutes.

WHEREFORE, Plaintiffs demand judgment against Defendant, PREFERRED LENDERS, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT XXV
## RESCISSION – PREFERRED LENDERS

445.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

446.    The Documents being sued upon are subject to rescission due to the existence of fraud and false representations, mistake, impossibility of performance, and/or unconscionability.

447.    In addition to the foregoing, PREFERRED LENDERS has engaged in inequitable conduct by violating several federal laws and conspiring with GINN to do same And to violate state laws.

448.    Plaintiffs have rescinded the Documents being sued upon or do hereby rescind the Documents and have notified PREFERRED LENDERS of such rescission or do hereby notify PREFERRED LENDERS of such rescission.

449.    Plaintiffs will restore the benefits of the Documents being sued upon that they have received to TG&O, is such restoration is possible.

450.    Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs demand judgment against Defendant, PREFERRED LENDERS, for rescission, damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT XXVI
### VIOLATION OF THE TRUTH IN LENDING ACT – PREFERRED LENDERS

451.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

452.   PREFERRED LENDERS violated one or more provisions of the Truth in Lending Act (TILA) and Regulation Z.

453.   Plaintiffs have been damaged as a proximate result of PREFERRED LENDERS'S TILA and Regulation Z violations and are entitled to statutory rescission therefore.

WHEREFORE, Plaintiffs demand judgment against Defendant, PREFERRED LENDERS, for rescission, damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT XXVII
### FRAUDULENT INDUCEMENT – PREFERRED LENDERS

454.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

455.   PREFERRED LENDERS fraudulently induced the Plaintiffs to enter into the Sales Agreement and the documents being sued upon and close on same.

456.   Plaintiffs have been damaged as a proximate result of PREFERRED LENDERS'S fraudulent inducement.

WHEREFORE, Plaintiffs demand judgment against Defendant, PREFERRED LENDERS, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT XXVIII
### FRAUDULENT MISREPRESENTATION – PREFERRED LENDERS

457.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

458.   PREFERRED LENDERS fraudulently misrepresented material facts to the Plaintiffs.

459.   Plaintiffs have been damaged as a proximate result of PREFERRED LENDERS'S fraudulent misrepresentations.

WHEREFORE, Plaintiffs demand judgment against Defendant, PREFERRED LENDERS, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT XXIX
### INNOCENT MISREPRESENTATION – PREFERRED LENDERS

460.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

461.   PREFERRED LENDERS innocently misrepresented material facts to the Plaintiffs.

462.   Plaintiffs have been damaged as a proximate result of PREFERRED LENDERS'S innocent misrepresentations.

WHEREFORE, Plaintiffs demand judgment against Defendant, PREFERRED LENDERS, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT XXX
INFORMATION NEGLIGENTLY PROVIDED FOR THE GUIDANCE OF OTHERS –
PREFERRED LENDERS

463.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

464.   PREFERRED LENDERS supplied false information to the Plaintiffs in the course of the PREFERRED LENDERS's business or the course of convincing the Plaintiffs to enter into and close on a real estate transaction and loan in which PREFERRED LENDERS had a financial interest.

465.   PREFERRED LENDERS was negligent in obtaining or communicating the false information, including, but not limited to the information regarding the circumstances regarding the construction of a home on the Property and the profitability of renting such a home out.

466.   Plaintiffs were persons for whose benefit and guidance PREFERRED LENDERS intended to supply the false information for use in the Plaintiffs' business transaction.

467.   PREFERRED LENDERS intended the false information to influence the Plaintiffs in that business transaction.

468.   Plaintiffs justifiably relied on the false information.

469.   Plaintiffs' reliance upon the false information caused them economic damage, including, but not limited to, those damages specified in paragraph 258.

WHEREFORE, Plaintiffs demand judgment against Defendant, PREFERRED LENDERS, for damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT XXXI
VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT – PREFERRED LENDERS

470.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

471.   PREFERRED LENDERS violated one or more provisions of the Equal Credit Opportunity Act (ECOA) and Regulation B.

472.   Plaintiffs have been damaged as a proximate result of PREFERRED LENDERS'S ECOA and Regulation B violations and are entitled to statutory rescission therefore.

WHEREFORE, Plaintiffs demand judgment against Defendant, PREFERRED LENDERS, for rescission, damages, special damages identified in paragraph 258, interest, costs, attorneys' fees. and such additional and further relief as this Court deems just and proper.

## COUNT XXXII
## VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT – GINN

473.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

474.   PREFERRED LENDERS violated one or more provisions of the Real Estate Settlement Procedures Act (RESPA) and Regulation X.

475.   Plaintiffs have been damaged as a proximate result of PREFERRED LENDERS'S RESPA and Regulation X violations and are entitled to statutory rescission therefore.

WHEREFORE, Plaintiffs demand judgment against Defendant, PREFERRED LENDERS, for rescission, damages, special damages identified in paragraph 258, interest, costs, attorneys' fees, and such additional and further relief as this Court deems just and proper.

## COUNT XXXIII
## VIOLATION OF RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS
## (RICO) – PREFERRED LENDERS

476.   Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

477.    This Count arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961 et seq., and the Florida RICO (Racketeer Influenced and Corrupt Organizations) Act, Chapter 895, Florida Statutes.

478.    PREFERRED LENDERS is an enterprise, within the meaning of 18 U.S.C. 1961 and § 895.02, Florida Statutes, which is engaged in, or the activities of which affect, interstate or foreign commerce.

479.    The fraudulent misrepresentations detailed above were made by PREFERRED LENDERS to Plaintiffs.

480.    The fraudulent misrepresentations set forth above represented a scheme and artifice to defraud Plaintiffs, which was facilitated by use of the United States Mail, caused by PREFERRED LENDERS, and resulting in mail fraud within the meaning of 18 U.S.C. 1341.

481.    The fraudulent misrepresentations set forth above represented a scheme and artifice to defraud Plaintiffs, which was facilitated by use of interstate wire communications including the internet, electronic mails, interstate facsimiles, and interstate telephone calls, caused by PREFERRED LENDERS, and resulting in wire fraud within the meaning of 18 U.S.C. 1343.

482.    The fraudulent misrepresentations set forth above represented a scheme and artifice to defraud Plaintiffs in violation of Securities Laws and resulting in fraud within the meaning of 18 U.S.C. 1961.

483.    PREFERRED LENDERS engaged in an agreement with GINN and various GINN affiliates, associations, and related companies to achieve an unlawful objective.  Said agreements constitute a conspiracy within the meaning of 18 U.S.C. 371.

484.    PREFERRED LENDERS knowing and voluntarily participated in the conspiracy and committed several overt acts in furtherance of the conspiracy.

485.    The acts of PREFERRED LENDERS's co-conspirators in furtherance of the conspiracy are attributable to PREFERRED LENDERS.

486.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. 1961(l) and Section 895.02(1), Florida Statutes.

487.    Wire fraud constitutes racketeering activity as that term is defined in 18 U.S.C. 1961(l) and Section 895.02(1), Florida Statutes.

488.    Security fraud constitutes racketeering activity as that term is defined in 18 U.S.C. 1961(l), 18 U.S.C. 1962, and Section 895.02(1), Florida Statutes.

489.    PREFERRED LENDERS's multiple fraudulent misrepresentations as detailed above constitute a pattern of racketeering activity within the meaning of 18 U.S.C. 1961(5) and Section 895.02(4).

490.    PREFERRED LENDERS and PREFERRED LENDERS's agents, associates, and representatives, have and have conspired to receive income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which they have participated as a principal within the meaning of section 2, title 18, United States Code, and to use or invest, directly or indirectly, such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, PREFERRED LENDERS's enterprise, including but not limited to GINN's affiliates and associations in violation of 18 U.S.C. 1962(a), (d) and Sections 895.03(1),(4). Florida Statutes.

491.    PREFERRED LENDERS and PREFERRED LENDERS's agents, associates, and representatives, have conspired to and have acquired or maintained, directly or indirectly, an

interest in or control of an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce through a pattern of racketeering activity in violation of 18 U.S.C. 1962(b), (d) and Sections 895.03(2),(4), Florida Statutes.

492.    PREFERRED LENDERS and PREFERRED LENDERS's agents, associates, and representatives, have conducted, and have conspired to conduct, the affairs of PREFERRED LENDERS through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c), (d) and Sections 895.03(3),(4), Florida Statutes.

493.    As a direct and proximate result of these violations of 18 U.S.C. 1962 and Section 895.03, Florida Statutes, Plaintiffs have suffered actual damages as a result of injury to its property.

494.    PREFERRED LENDERS is liable to Plaintiff for treble damages, together with all costs of this action plus reasonable attorney's fees, all as provided under 18 U.S.C. 1964 and Section 895.05, Florida Statutes.

495.    Plaintiffs have been proximately damaged by PREFERRED LENDERS'S RICO violations, including, but not limited to, those damages specified in paragraph 258, all money paid by Plaintiffs to GINN under the purchase agreement, and costs of travel to and from the developments.

WHEREFORE, Plaintiffs request relief, as follows: that they be granted judgment against PREFERRED LENDERS in the total amount of all damages suffered by them as a result of PREFERRED LENDERS's wrongful acts; that they be awarded special damages identified in paragraph 258 and 495; that they be granted judgment against PREFERRED LENDERS for treble damages suffered by reason of injury to its property as a result of PREFERRED LENDERS's violations of 18 U.S.C. 1962 and Chapter 895, Florida Statutes; that they be

granted judgment against PREFERRED LENDERS for all costs of this action, including reasonable attorney's fees; and that this Court grant them any other relief that it considers just and appropriate under the circumstances.

COUNT XXXIV
CIVIL CONSPIRACY – PREFERRED LENDERS

496.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

497.    PREFERRED LENDERS conspired with GINN, GINN-PINE ISLAND and various appraisers to make fraudulent misrepresentations, fraudulently conceal material facts and information from Plaintiffs, violate the Equal Credit Opportunity Act, violate ILSA, violate federal securities law, violate RESPA, violate the standards and laws applicable to professional realtors and appraisers, and to do so by unlawful means.

498.    PREFERRED LENDERS communicated with GINN and various appraisers, and Plaintiffs and made misrepresentations to Plaintiffs in furtherance of the conspiracy.

499.    By virtue of their association, PREFERRED LENDERS, GINN, and various appraisers had a peculiar power of coercion that none of them would otherwise possess.

500.    PREFERRED LENDERS, GINN, and various appraisers acted in bad faith and with corrupt and malicious motive in carrying out their conspiracy.

501.    PREFERRED LENDERS, GINN, and various appraisers exercised coercion through numbers or economic influence.

502.    Plaintiffs have suffered damages as a result of the conspiracy.

WHEREFORE, Plaintiffs pray this Honorable Court enter a judgment against Defendant, PREFERRED LENDERS, for damages, special damages identified in paragraph 258, costs, and attorney's fees together with such further relief as this Court deems appropriate.

94

COUNT XXXV
PROFESSIONAL NEGLIGENCE -- CENTURY 21

503.    Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 259 as if fully set forth herein.

504.    CENTURY 21 committed professional negligence and Plaintiffs were damaged as a proximate result of same.

WHEREFORE, Plaintiffs pray this Honorable Court enter a judgment against Defendant, CENTURY 21, for damages, special damages identified in paragraph 258, costs, and attorney's fees together with such further relief as this Court deems appropriate.

DATED this 17TH day of June, 2008.

DAMON A. CHASE, ESQUIRE
Florida Bar No.: 642061
R. DAVID MCLAUGHLIN, ESQUIRE
Florida Bar No.: 0029232
CHASE | FREEMAN, P.A.
250 International Pkwy., Suite 250
Lake Mary, Florida 32746
(407) 333-7337 - Telephone
(407) 333-7335 - Facsimile
Attorneys for Plaintiffs